Schmidt *v.* Opie and Reimer.

---

### Caroline Schmidt

*v.*

### Abram S. Opie and William H. Reimer.

1. Any one liable on a contract, express or implied, though only contingently liable, is a debtor, within the meaning of the statute of frauds, from the date of his contract.

2. All that a judgment creditor need do, who seeks the aid of a court of equity against his debtor's land, is to show a judgment at law creating a lien thereon; but if he seeks aid in respect to his debtor's personal estate, he must show not only a judgment, but that an execution has been issued.

3. On an agreement for the sale of land being made, the purchaser becomes, in equity, the owner of the land, and the vendor becomes the owner of the purchase-money.

4. If a mortgagor executes a mortgage for a fraudulent purpose, and the mortgagee accepts it, with knowledge of the mortgagor's purpose, intending to aid him in such purpose, the mortgage will be held void as to those who are defrauded by it, even if it is founded on a perfect consideration.

On final hearing on bill, answers and proofs, taken before the vice-chancellor.

*Mr. Joseph P. Osborne,* for complainant.

*Mr. John Schomp,* for defendants.

THE VICE-CHANCELLOR.

This is a foreclosure suit. No defence is made by the owner of the equity of redemption, but two judgment creditors of the mortgagor attack the validity of the complainant's mortgage. They say, first, that the mortgage is without consideration, and should, for that reason, be set aside; and, second, that if it is founded on a valid consideration, it was executed for the purpose of defrauding them, and is therefore void as to them. The second ground is the only one I shall consider.

The defendants must be considered creditors from the date of the contracts under which their claims arose, namely, from February 25th, 1875. The rule upon this subject, as laid down in another case, is this: Any one liable upon a contract, express or implied, though only contingently, is a debtor, within the meaning of the statute of frauds, from the date of his contract. *Post* v. *Stiger, 2 Stew. Eq. 554.*

The defendants were not bound to show, as preliminary to their right to seek the aid of this court, that executions had been issued upon their judgments and returned unsatisfied. All that a judgment creditor need do, who seeks the aid of a court of equity against the real estate of his debtor, is to show a judgment at law creating a lien on such estate. Under our statute a judgment is a lien on lands from its recovery. But if a creditor wants the aid of the court in respect to the personal estate of his debtor, he must show, not only a judgment, but that an execu-

tion has been issued. A judgment does not bind personal estate; such property can only be reached by an execution. *Robert* v. *Hodges, 1 C. E. Gr. 299.*

The question of fact presented by the case is this: Was the mortgage executed with intent to defraud the defendants, and, if so, was the mortgagee a party to the fraud? The mortgage was made by one brother to another—by John Schmidt to Charles Schmidt—and bears date March 1st, 1875, but was not acknowledged until March 5th. Prior to the making of the mortgage, John Schmidt had agreed to convey the mortgaged premises to the defendant Opie, and Opie's judgment is founded on a breach of that contract. The contract bears date February 25th, 1875, and required John to make a deed to Opie on the 10th of the following month. By that contract, Opie became the owner, in equity, of the mortgaged premises. It is a fundamental rule of equity jurisprudence, that upon an agreement for the sale of land, the purchaser becomes the owner of the land, and the vendor becomes the owner of the purchase-money. The contract creates a trust. By force of it, the vendor becomes trustee of the legal estate for the vendee, and the vendee becomes trustee of the purchase-money for the vendor. If the vendor conveys the land to another, and his grantee takes title with notice of the prior contract, he will take the land subject to a trust in favor of the first purchaser, who may compel a conveyance of it. *Haughwout* v. *Murphy, 7 C. E. Gr. 531.*

Charles Schmidt took his mortgage with full notice of the Opie contract, and that John wanted to escape the performance of it. The complainant is the wife of John Schmidt, the mortgagor. She says that it was arranged originally that Charles was to take a mortgage on the Opie farm—by the contract, Opie was to convey a farm to John in exchange for the mortgaged premises—but when he found that Opie intended to cheat John, he demanded a mortgage on the mortgaged premises. It also appears from the complainant's evidence that John had made up his mind, on the very day he signed the contract, not to perform it. She says he told her, on his return from Somerville the day the contract was signed, that he had heard that there was another

Schmidt v. Opie and Reimer.

mortgage on the farm besides the one Opie had told him about, and that he had made up his mind not to take the farm. John says that he had told Charles, before Charles asked him to give a mortgage, that he had made a contract to convey the mortgaged premises to Opie, and that the object of his visit to Charles, when he gave him this information, was to see what he could do to satisfy Charles for what he owed him.

These facts render it perfectly clear, I think, that Charles knew, when it was arranged that the mortgage should be given, that John had agreed to convey the mortgaged premises to Opie, and that he did not mean to keep his contract. Charles also knew that the execution of the mortgage to him would put it out of John's power to perform his contract. That, undoubtedly, was the object that both intended to accomplish by the mortgage. It is practically confessed.

This rendered the mortgage an instrument of fraud, and made it utterly void against those who were defrauded by it. The fact that it was founded on a full, valuable consideration, will not save it. Such an instrument may be even more effectual as a means of fraud than a mortgage without consideration. A mortgagee, to be able to successfully resist the impeachment of his security, must appear to be not only a mortgagee for value, but a mortgagee in good faith. If it appears that his mortgagor executed the mortgage for a fraudulent purpose, and that he knew of such purpose, and took the mortgage to aid him in its execution, his mortgage is void against those who are defrauded by it, even if it is founded on a perfect consideration. *Green* v. *Tantum, 4 C. E. Gr. 105; S. C. on appeal, 6 C. E. Gr. 364.*

The conduct of the parties furnishes very important evidence, and leaves no doubt with what intent they planned the execution of this mortgage. The debt which it is alleged the mortgage was given to secure, had been standing a long time—part of it since 1865, and all of it since 1869. It had been incurred in sums of from $25 to $1,350. No evidence of indebtedness of any kind is shown to have been given or made. No payment of either principal or interest was ever made; and although the debtor borrowed $1,500 on mortgage on these very premises,

and deposited the money in a savings bank, and kept it there a long time, with the knowledge of the creditor, yet the creditor never asked for payment, nor did the debtor offer to pay. As soon as the mortgage was delivered, the mortgagee made a gift of it to the mortgagor's wife. The mortgage, though dated March 1st, 1875, was not acknowleged until March 5th. The assignment to the complainant is dated March 5th, 1875, so that it would seem the only object the mortgagee could have had in getting security for his debt was to present the security to his debtor's wife. His gift shows that he did not want security for his own protection. Why did he not give her the debt, and let her get it secured or not, as she thought proper? That, it seems, would have been the course which would have been pursued if it had not been intended that the mortgage should help the mortgagor escape the performance of his contract.

Besides, I find it very difficult to believe that this mortgage ever had any real consideration. Charles may have given John money at various times; the several sums thus given may have aggregated a large sum; but was it understood, as the moneys were advanced, that the relation of creditor and debtor existed; and were the moneys advanced with an expectation of payment, on one side, and an intention to pay, on the other? Charles was prosperous and wealthy, and without children; John had but little property and a large family. Charles took nothing to show for the money advanced, and so far as appears, he made no charge of it. His advances or gifts extended over a period of four or five years, but no payments were made, though Charles knew John had on deposit in bank the sum of $1,500. At any time between 1869 and 1875, John could have given Charles the same security that he gave him in March, 1875; but neither party seems to have regarded the advances as a debt until John got into trouble, and then they were treated as a debt, and a mortgage was given for them, which was immediately transferred to John's wife as a gift. These facts furnish very cogent evidence to my mind that if John had not got into trouble, no mortgage would have been given and no debt claimed. The proofs convince me that Charles's object in taking the mortgage was to help

John escape the performance of his contract with Opie. Their fraud was aimed directly at him, and he has a clear right to . redress against it.

The mortgage must be declared void as to the defendants, Opie and Reimer, but good as to the other parties. This result simply affects the order in which the liens against the mortgaged premises must be paid. The mortgaged premises will be ordered to be sold, and the proceeds of sale must be first applied in satisfaction of the judgments of Opie and Reimer, and their costs in this court, and then to the payment of the complainant's mortgage.