18 N.J. Super. 206 (1952)
86 A.2d 820
NICHOLAS F. GALLICCHIO, PLAINTIFF,
v.
STANLEY WALTER JARZLA, ROSIE JARZLA AND MORRIS ROSEN, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 25, 1952.
*207 Messrs. Gebhardt & Kiefer (Philip R. Gebhardt appearing), attorneys for plaintiff.
Mr. Edwin K. Large, Jr., attorney for defendants Stanley Walter Jarzla and Rosie Jarzla.
Mr. George Warren, attorney for defendant Morris Rosen.
*208 GOLDMANN, J.S.C.
On October 13, 1950, defendant Stanley Walter Jarzla, husband of defendant Rosie Jarzla, entered into an agreement with defendant Morris Rosen for the sale of the Jarzla farm in West Amwell Township, Hunterdon County, for $28,000. The real estate was described as "consisting of one house, outer buildings, barn, wagon house, two chicken coops, six brooder houses, four shelters and 90 acres more or less." The transaction included personal property consisting of livestock and chickens, farm machinery and equipment, harvested crops and miscellaneous farm tools. The agreement contained the usual provisions that it was entered into "upon the knowledge of the parties as to the value of the land and whatever buildings are upon the same, and not on any representations made as to character or quality."
Rosen paid a deposit of $1,000; $21,000 cash was to be paid at closing and the seller was to take back a second purchase money mortgage of $6,000 which was to cover all chattels and stock. Rosen was to have possession the day title passed, but the Jarzlas were to have the right to occupy three rooms on the premises until April 1, 1951, the rent to be agreed upon between the parties. The closing was fixed for November 13, 1950. However, plaintiff Gallicchio, attorney for the Lambertville National Bank which was to be Rosen's first mortgagee, had not completed the title search by that date. The closing was extended at Gallicchio's suggestion and finally took place in his office on November 28, 1950. In the meantime, the hurricane of November 25, 1950, damaged certain buildings and fencing on the property. The agreement of October 13, 1950, contained no provision as to risk of loss.
The Jarzlas were represented at the closing by their own attorney. Rosen refused to go through with the deal, claiming that the damage to the buildings and fencing amounted to a failure of consideration. He insisted upon a reduction in the purchase price. The Jarzlas refused. The parties tried to fix a value for repairing the damage and, after some *209 discussion and in order not further to delay the closing, finally entered into the following escrow agreement:
November 28, 1950
The parties hereto agree that the said Stanley Jarzla and Rosie Jarzla, his wife, are to restore all of the damages suffered to the buildings and fences on the property this day sold by the said Stanley Jarzla and Rosie Jarzla, his wife, to Morris Rosen.
All the work is to be done in a reasonable and workmanlike manner.
The parties hereto agree that Nicholas F. Gallicchio, Esq., shall hold in escrow, the sum of Twenty-five Hundred ($2,500.00) Dollars, for a period of thirty (30) days, weather permitting, to insure the faithful performance of this work."
The Jarzlas then executed an appropriate warranty deed and bill of sale to Rosen and he gave them a chattel mortgage and paid the balance of the purchase price, at the same time executing a bond and mortgage to the Lambertville National Bank.
The Jarzlas undertook to repair the storm damage. On January 18, 1951, they notified plaintiff that the repairs had been completed in accordance with the escrow agreement and demanded payment of the $2,500. Rosen disputed the repairs and refused to allow plaintiff to pay over the money. Plaintiff thereupon brought this interpleader action to determine the respective rights of the Jarzlas and Rosen to the $2,500 in his hands.
Rosen's answer and cross-claim sets up failure by the Jarzlas to perform the terms of the escrow agreement and a breach thereof. He demands judgment that the $2,500 belongs to him, and also judgment against the Jarzlas for an additional $1,000, the amount over and above the escrow fund alleged to be necessary to complete the repairs. The Jarzlas, in turn, cross-claimed against Rosen, alleging that the repairs had been properly made and the escrow agreement performed. They further claim that Rosen was obligated to accept the premises in the condition in which they were at the time of closing and hence there was no consideration for the escrow agreement, and it was null and void. They *210 demand judgment for the $2,500 and costs. Rosen answered this cross-claim, affirming the validity of the escrow agreement and denying that the repairs were properly made. At the same time he counterclaimed against the Jarzlas for $500 for farm tools that were to have been delivered to him, but which he claims were not. The Jarzlas deny the allegations of the counterclaim.
On behalf of the Jarzlas it is argued that (1) the risk of loss under the agreement of October 13, 1950, was upon Rosen, and (2) no consideration passed to them for the escrow agreement of November 28, 1950.
The New Jersey rule as to risk of loss was clearly stated by Chancellor Magie in Marion v. Wolcott, 68 N.J. Eq. 20, at p. 22 (Ch. 1904):
"It is the settled doctrine of our courts of equity that, under a contract for the sale of lands, the purchaser becomes the equitable owner of the lands, and the seller the equitable owner of the purchase money. King v. Ruckman, 21 N.J. Eq. (6 C.E. Gr.) 599; Haughwout v. Murphy, 22 N.J. Eq. (7 C.E. Gr.) 531; Schmidt v. Opie, 33 N.J. Eq. (6 Stew.) 138.
It is also declared to be the doctrine of equity that when, under such a contract of sale, the equitable beneficial interest passes to the buyer, and he becomes, in the contemplation of equity, the real owner, he takes the benefit of all subsequent improvements and increase of value, but he will also be subject to all losses and depreciations not occasioned by the neglect or default of the seller in carrying out the contract. Pom. Spec. Perf. § 522; Fry Spec. Perf. §§ 895-897; Pom. Eq. Jur. §§ 368, 1406.
The doctrine last mentioned is obviously a mere corollary to that above stated, which has been asserted in our courts in the cases above cited and in numerous others."
In that case defendant had agreed in writing to sell a certain house and lot to complainants for $1,550. They were to pay in monthly installments and receive a deed when the full purchase price had been paid. Complainants agreed to insure the buildings in favor of defendant, as his interest might appear, for at least $625. They went into possession and made improvements. They also procured the required policy but failed to renew it upon its expiration. The insurance *211 agent then made out a new policy and sent it to defendant, who returned it because he already had a blanket policy covering not only the house for $625 but his other properties as well. Thereafter, and before complainants had paid in full and received the deed, the house was destroyed by fire. Defendant collected the insurance and credited the $625 against the purchase price. The complainants sought the aid of the court in requiring defendant to pay them the $625 or to rebuild the house and specifically perform the contract. The court dismissed their bill with costs.
Rosen's attorney argues that Marion v. Wolcott does not apply because, unlike in this case, the buyers there had already gone into possession when the house burned down. However, our courts have not considered possession a controlling factor in applying the broad principle of Marion v. Wolcott. For example, in Cropper v. Brown, 76 N.J. Eq. 406 (Ch. 1909), a foreclosure action, Gormley was the successful bidder at a sheriff's sale of the mortgaged premises. He paid ten per cent of the purchase price at the sale and was to pay the balance and receive possession and a deed at a later date. That night the house was destroyed by fire. Gormley petitioned to be relieved of his bid or to be allowed a deduction for the amount of the loss. His petition was dismissed with costs, and the sale confirmed. The vice-chancellor stated that "there is no real distinction in this State in respect to the principles to be applied respecting the rights of the parties between judicial sales and other similar sales voluntarily made between parties," and quoted with approval the conclusion found in the note in 57 L.R.A. 643, at 654:
"Under the familiar doctrine that equity considers as done that which was agreed to be done, a contract for the sale of land operates as an equitable conversion. The vendee takes an equitable title, and his interest under the contract becomes realty; in case of his death before the conveyance is made the title descends to his heirs; he is entitled to all benefits attaching to the property, and must bear all losses, unless the contract shows a contrary intention on the part of the parties; he may execute a valid mortgage or deed of the property; and is entitled to the usual *212 benefits attaching to the ownership of the property, subject, however, to the rights of the vendor, who holds the legal title as security for the payment of the purchase money.
Conversely, the vendor's interest constitutes personalty, and on his death, is distributable as such. He holds the legal title as trustee for the purchaser and as security for the payment of the purchase money. He cannot give a valid deed or mortgage of the property to one having knowledge of the vendee's equities, though he may transfer his interest under the contract. The decisions are conflicting as to whether a judgment against him constitutes a lien on the property; some hold that it does not constitute a lien, while others hold that it constitutes a lien on his interest in the property which may be sold under the judgment.
The doctrine will not be applied where it is apparent from the contract that the parties intended that it should not operate as an equitable conversion.
Neither will it be applied where the contract is one the specific performance of which cannot be enforced.
The conversion takes place at the time of the execution of the contract, even though the purchaser does not take possession or pay the purchase price; though in some cases where the decisions were based on the language of the particular contracts, it was held that the equitable title did not pass until the performance of certain conditions." 76 N.J. Eq. at pp. 420-421.
The vice-chancellor concluded:
"It has been consistently held that by a completed contract of sale the vendee acquires an insurable interest in the premises, and this is so, irrespective, in my view, of whether or not he has taken possession. It is not the fact of possession which creates the beneficial equitable right in him; it is by force of the contract. Both the vendor and the vendee have insurable interests."
The New Jersey rule is in accord with the majority view in this country: the purchaser under an unconditional contract for the sale of real property is held to assume the risk of a partial destruction or deterioration of the property from the date of the contract, where the loss is not due to a fault of the buyer and where the seller at the time of the loss is not in default and is able to convey a good title. "The rule has been applied although the possession was not to be delivered to the purchaser until a future day, and prior to such time the loss occurred, since it is the nature of the purchaser's equitable title which casts the burden of the *213 loss on him, and not the fact of possession." 55 Am. Jur., Vendor and Purchaser, p. 819, § 397.
The majority rule has been vigorously criticized by Williston and other authorities. 4 Williston on Contracts (Rev. ed. 1936), pp. 2605-2637, §§ 928-943; and see Brown, "Risk of Loss Occurring between Date of Contract to Sell Real Estate and Transfer of Legal Title," 22 Cal. L. Rev. 427 (1934), for a summary of the differing views expressed by leading text writers. In discussing what has been called "the English rule," which goes back to Lord Eldon in Paine v. Meller, 6 Ves. 349 (1801), Williston says (at pp. 2607-8, § 929):
"It is sometimes said that equity regards as done what is agreed to be done; sometimes, that from the moment of the contract the vendor is trustee for the purchaser; sometimes, that from that moment the purchaser is the owner in equity, subject of course to a lien for the unpaid price. As many of the decisions are based simply on a repetition of a formula of this sort, it is worth while to consider the validity of the formula as such without reference to its particular applications. It can hardly be denied that present ownership is a different thing from future ownership. However certain it may be that in the future one will become the owner of property, it is a different thing from owning it now. When, therefore, it is said that equity regards one who has a contract right to have property in the future as the immediate owner of it, it is in effect said that equity regards two things which are inherently different as the same. Only the hoary age and frequent repetition of the maxim prevents a general recognition of its absurdity. If the statement were made that in equity one who has contracted to buy property has some rights analogous to those of an owner of the property, inquiry would be natural in an individual case whether the particular right or duty of an owner then in question had been acquired by the purchaser; but when it is said broadly that he is the owner in equity, or that he is in effect a mortgagor, further consideration seems precluded, and one who accepts the maxim denies himself the effort of further thought. So, also, calling the relation between the parties the `vendor-purchaser relation,' and assuming that this involves the conclusion that the purchaser must pay for what he does not get has the same vice. If our law had definitely adopted such a proposition, there would be perhaps little use in commenting upon it, but this is not the case. It will be evident from the following discussion that the position of the purchaser differs, not only in theory, but under the established law, in essential particulars from either an owner *214 or a mortgagor, and, therefore, since the only reason that can be given for throwing the risk on the purchaser is that he is the beneficial owner, the reason failing, the rule also should fall."
Williston would have the risk "rest on that party to a contract who, by the terms of the agreement has, or has agreed to have at the time, the substantial rights peculiar to present ownership, as distinguished from the rights of one who has an option or rights of a future owner." 4 Williston on Contracts (Rev. ed. 1936), pp. 2627-8, § 939. This approach may have substantial merit and has, in fact, been adopted elsewhere, but it does not reflect the present state of our decisional law.
The applicability of the majority rule which places risk upon the buyer in the circumstances of this case is not defeated by the fact that personal property was included in the transaction. In unanimously affirming on the opinion below of Vice-Chancellor Leaming, the Court of Errors and Appeals in Peoples Water Company v. Millville, 95 N.J. Eq. 732 (E. & A. 1924) held (at p. 741) that there seemed to be no sound reason for denying the application of the equitable rule as to risk of loss followed by our courts, merely because the contract of sale in that case included, in addition to real estate, water mains which the defendant contended were in the nature of personal property. And in Martindell v. Fiduciary Counsel, Inc., 133 N.J. Eq. 408 (E. & A. 1943), Justice Heher said (pp. 413-414):
"A dividend declared on corporate capital stock during the pendency of a mere option to purchase the shares inures to the transferor, even though payable in futuro. But if there be no provision otherwise, a dividend declared on shares constituting the subject of a binding executory contract of sale, after the making of the contract and before the consummation of the sale, is the property of the transferee. Equity regards and treats as done what in good conscience ought to be done. Under this cardinal equitable principle, there being no contrary intent, executory contracts for the sale of lands or chattels, while considered as executory for some purposes in equity as well as at law, are from the outset regarded in equity as executed so far as concerns the interest *215 or estate in the subject matter and as operating to transfer that interest to the vendee. An equitable estate or interest commensurate with the requirements of the contract of sale is vested in the vendee. Although the vendor still has the legal title, he holds it in trust for the vendee. The beneficial interest is in the vendee. This is so as to the parties to the contract and, as well, all who take with notice of the vendee's equitable rights. Compare King v. Ruckman, 21 N.J. Eq. 599; Haughwout v. Murphy, 22 N.J. Eq. 531; Schmidt v. Opie, 33 N.J. Eq. 138; Marion v. Wolcott, 68 N.J. Eq. 20. While these cases concern contracts for the sale of land, this great equitable principle is likewise applicable to agreements for the sale of personal property and things in action, even assignments of future and contingent interests and possibilities therein when made upon a valuable consideration. Pom. Eq. Jur. (5th ed.) §§ 368, 369, 1270, et seq., 1280, et seq., 1285, et seq."
Defendant's argument that risk of loss was on the sellers is based on the views of Williston, Langdell and others, already mentioned. Von Waldheim v. Englewood Heights Estates, Inc., 115 N.J.L. 220 (E. & A. 1935), cited by defendant, is not in point; there was impossibility of performance in that case because the State condemned the lands that were the subject matter of the sale. Moreover, there was evidence of mutual rescission to support the verdict for the plaintiff-buyer in the amount paid by him under the contract. Brauer v. Hyman, 98 N.J.L. 743 (E. & A. 1923), also cited, was a case where performance of the contract for the sale of a liquor business was rendered impossible by operation of law; passage of the Prohibition Act of 1919 destroyed the subject matter of the transaction.
Risk under the contract thus having been on Rosen, can he found his cross-claim on the escrow agreement? In reply to the argument that this agreement was without consideration he claims that he had contracted to buy a completely equipped and stocked farm; that having been offered something less at settlement because of the intervening storm damage, he asserted what he considered to be his absolute right to refuse to accept the damaged farm; that the Jarzlas disputed his right to repudiate the contract; that in order to expedite the consummation of the sale, the parties agreed to resolve the dispute by means of the escrow agreement, *216 and that this compromise of his assertion of right, founded in good faith, furnished a binding consideration.
Counsel quotes from Grandin v. Grandin, 49 N.J.L. 508 (Sup. Ct. 1887). In that case plaintiff had filed a caveat against the probate of a will which named defendant, his brother, as residuary legatee. Plaintiff withdrew the caveat, assigned all of his right, title and interest in the real and personal estate of the deceased (other than what had been left him under the will), and made no further opposition, in consideration of defendant's promise to pay him $300 and assign 200 shares of a certain stock. Although plaintiff completely performed his side of the agreement, defendant refused to assign the shares. In giving plaintiff judgment, the court said (p. 514):
"The compromise of a disputed claim made bona fide is a good consideration for a promise, whether the claim be in suit, or litigation has not been actually commenced, even though it should ultimately appear that the claim was wholly unfounded; the detriment to the party consenting to a compromise arising from the alteration in his position forms the real consideration which gives validity to the promise. The only elements necessary to a valid agreement of compromise are the reality of the claim made, and the bona fides of the compromise. Cook v. Wright, 1 B. & S. 559-570; Callisher v. Bischoffsheim, L.R. (5 Q.B.) 449; Ockford v. Banelli, 25 L.J. 504; Miles v. N.Z., &c., Est. Co., 32 Ch. Div. 267, 283, 291, 298."
The phrase "the reality of the claim made" was explained in Rue v. Meirs, 43 N.J. Eq. 377 (Ch. 1887), as meaning "that the claimant shall assert his claim in good faith, believing it is real, or, in the language of Lord Justice Cotton, in Miles v. New Zealand Alford Estate Company, L.R. (32 Ch. Div. 266), `a claim is honest if the claimant does not know that his claim is unsubstantial, or if he does not know the facts which show that his claim is a bad one.'" Rue v. Meirs, like Grandin v. Grandin, was a suit brought on an agreement to forbear protest of a will which directed distribution of the estate in a manner claimed to be prejudicial to plaintiff and her brother  a claim defendants seemingly recognized because they bought their peace.
*217 The oft-quoted language of the Grandin case exemplifies the liberal modern doctrine of the English cases which seem to have gone much further than those elsewhere in holding that if a claim is honestly asserted and is "reasonable" or is "not vexatious and frivolous," the forbearance or promise of forbearance to prosecute the claim is sufficient consideration. Williston on Contracts (Rev. ed. 1936), pp. 471-9, § 135.
Rosen here simply refused to go through with the purchase unless he received a reduction in price or the damaged buildings and fencing were repaired. There was no suit or threat of suit, as in the Grandin and Rue will cases. The situation here is unlike that in other cases cited on behalf of Rosen, among them Worcester Loom Co. v. Heald, 78 N.J.L. 172 (Sup. Ct. 1909); Weir v. Allen, 89 N.J.L. 597 (E. & A. 1916); Military College Co. v. Brooks, 107 N.J.L. 28 (Sup. Ct. 1929); and Second Nat'l Bank of Paterson v. Curie, 116 N.J. Eq. 101 (E. & A. 1934) where there was compromise of what was a standing, open, two-way dispute between the parties.
All that Rosen did in return for the Jarzla promise to repair the storm damage was nothing more or less than he was legally bound to do under the original contract, which called for his executing a $6,000 chattel mortgage and paying the $21,000 cash balance at settlement, and accepting the sellers' warranty deed and bill of sale. Doing what one is already legally bound to do is an unreal consideration. Schaefer v. Brunswick Laundry Co., 116 N.J.L. 268 (E. & A. 1935); Haynes Auto Repair Co. v. Wheels, Inc., 115 N.J.L. 447 (E. & A. 1935); Durant v. Block, 113 N.J.L. 509 (E. & A. 1934). Justice Heher notes, in Levine v. Blumenthal, 117 N.J.L. 23 (Sup. Ct. 1936), at p. 27, that this principle, now so firmly embedded in our jurisprudence, "has been criticized, at least in some of its special applications, as `medieval' and wholly artificial  one that operates to defeat the `reasonable bargains of business men.'" He goes on to say:
*218 "But these strictures are not well grounded. They reject the basic principle that a consideration, to support a contract, consists either of a benefit to the promisor or a detriment to the promisee  a doctrine that has always been fundamental in our conception of consideration. It is a principle, almost universally accepted, that an act or forbearance required by a legal duty owing to the promisor that is neither doubtful nor the subject of honest and reasonable dispute is not a sufficient consideration."
And see 1 Williston on Contracts (Rev. ed. 1936), pp. 443-450, §§ 130 and 130A; Restatement, Contracts, § 76.
But even were the court to grant the argument that the escrow agreement is solidly founded upon an adequate consideration, Rosen cannot succeed on his cross-claim. The promise he exacted from the Jarzlas was that they would repair the "damage suffered to the buildings and fences on the property * * *. All the work is to be done in a reasonable and workmanlike manner." On balance, the testimony supports the conclusion that the repairs were carried through as promised. The damaged buildings were restored to a condition as good as they were at the time the parties executed their agreement, when Rosen made a complete inspection of the premises. An old woodshed that had been blown down was reassembled and roofed with corrugated tin. Shingles were replaced on the house and a corner of the barn, as were slates on the so-called "machine shop." Some 20 feet of fencing was put back in place. Two brooder houses suffered in the storm; one was broken and the other overturned. The latter was uprighted by the Jarzlas. These houses were dilapidated and had little or no value. In fact, Rosen's son who was active about the place in his father's interest, told the Jarzlas after the storm to burn them up. The claim that the Jarzlas failed to remove a tree stump or repair a well damaged in the fall of the tree, cannot be considered because they are not mentioned in the escrow agreement.
The Rosen counterclaim demands $500 damages for farm tools not delivered by the Jarzlas. The proofs on this aspect of the case were unsatisfactory. The sellers provided *219 a list of the tools called for by the agreement in their answer to interrogatories asking for this information. Their testimony was that all the tools were delivered to Rosen. The Rosen testimony was quite general and vague  there were tools missing after the Jarzlas left but just what these tools were, specifically, and their value, was not given.
There will be judgment for the Jarzlas.