47 N.J. Super. 334 (1957)
136 A.2d 57
LAKE INTERVALE HOMES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
THE TOWNSHIP OF PARSIPPANY-TROY HILLS, IN THE COUNTY OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided August 30, 1957.
*336 Messrs. Budd, Larner & Kent (Mr. Samuel A. Larner appearing), attorneys for plaintiff.
*337 Messrs. Jeffers, Mountain & Franklin (Mr. Worrall F. Mountain, Jr., appearing), attorneys for the defendant.
HALL, J.S.C. (orally).
This is another chapter in the litigious history of the Lake Intervale development in defendant township. That history derived from prior reported decisions, and the evidence presented to date in the instant case forms the background of the precise issue presently before the court.
This suit seeks to recover money damages from the township representing plaintiff's cost of constructing streets and installing water mains in certain sections of the development. It is brought on a quasi-contractural theory.
On June 9, 1941 the township committee approved a map of the development, the entire tract then being owned by the Lake Intervale Corporation. The map was filed in the Morris County Clerk's Office July 11, 1941. By the map the tract of 70 acres or so, bounded on the north and west by Intervale Road, an established highway, was divided into over 300 lots laid out, except for a few fronting on Intervale Road, on some 13 new interior streets, roughly surrounding a small lake. Practically all of the lots had a frontage of approximately 50 feet and were of varying depths, running from 100 to 200 or so feet, the great majority being from 103 feet to 130.
At that time the municipality had no zoning ordinance or subdivision regulation ordinance. The map was approved and filed under the so-called "Old Map Act," R.S. 46:23-1 to 9, inclusive. Municipal action was required by R.S. 46:23-2(e), which prohibited filing where a map showed new streets until the streets as shown were approved by the governing body. By this statute, and in the light of its purpose to avoid confusion in conveyances, the governing body's approval of the map is confined to that effect. Magnolia Development Company v. Coles, 10 N.J. 223, 226 (1952). The delineation of the lots on such an approved map is no guaranty that each will be sufficient in itself to be built upon when the time comes to do so. Ardolino v. *338 Florham Park Board of Adjustment, 24 N.J. 94, 103 (1957). After the filing of the map the municipality assessed the tract for tax purposes on an individual lot basis.
The first zoning ordinance was adopted in 1945, placing this tract in a single-family residential zone, and which, by virtue of various amendments, required as of July 1952 a minimum lot area of 15,000 square feet with a minimum frontage of 100 feet, except that where, as here, a map had been approved by the township committee and/or the planning board and filed in the county clerk's office before the passage of the ordinance as amended, containing lots less than 15,000 square feet in area, any such lot would be occupied by a single-family dwelling if the lot had a minimum frontage of 100 feet "and a minimum depth equal to the minimum depth shown on said map for any lot within the whole area covered by the particular lot thus to be occupied by a single family dwelling."
It would appear that no single lot on this map meets this requirement, and only a very few met the requirement prior to the 1952 amendment. In prior litigation it was held that such zoning regulations adopted subsequent to the filing of the map are applicable to the lands delineated thereon. Rodee v. Lee, 14 N.J. Super. 188 (Law Div. 1951); Herman v. Board of Adjustment of Parsippany-Troy Hills Township, 29 N.J. Super. 164 (App. Div. 1953). It should also be noted that the streets shown on the Lake Intervale map, as filed, are also found on the township zoning map.
I take it that in the early years, at least until 1950, the development was singularly unsuccessful, perhaps due to war conditions. Apparently only a very few lots were sold; the evidence before me is not specific. As a result of a mortgage foreclosure sale held in late 1949 and completed in February 1950, Reid Development Corporation acquired title to 332 of the lots. This corporation was dominated by Mr. Abraham M. Herman, a lawyer, since deceased. Maneuvering and litigation thereafter commenced, first seeking to avoid the effect of the minimum lot area and frontage requirements *339 of the zoning ordinance. By deed dated May 21, 1950, but not recorded until September 27 of that year, six days before the date of passage of one of the zoning amendments involved, Reid conveyed 90 lots to Herman's wife Fannie, for an evident consideration of $500. These lots were apparently in the eastern end of the development with which we are principally concerned in the instant suit. The lots so conveyed were not contiguous but in each instance separated by one still owned by Reid. Apparently about the same time at least 11 lots in the same general area were conveyed to a man named Rodee. Some of these were contiguous; two were not. Efforts to secure variances to permit building on the 50-foot lots on a claim of undue hardship were unsuccessful, except as to the two isolated lots purchased by Rodee, in the Rodee and Herman cases, supra, the court in the latter decision pointing out that the conveyance to Mrs. Herman "was adroitly purposeful in an anticipated effort to avoid the restrictions of the expected ordinance." In the lots involved in the present litigation we find plaintiff meeting zoning ordinance requirements by combining contiguous lots to make up required area and frontage for a single dwelling.
The evidence before me is to the effect that prior to 1954 only eight lots had been built upon, although apparently some others had been sold here and there to persons other than Reid, Mrs. Herman and Rodee. The evidence on the latter point is very general and vague. The houses built were obviously under an earlier provision of the zoning ordinance permitting single-family residences on lots of less than 7,500 square feet in old platted areas, and they are said to be about 15 years old. One street, Lake Drive, for a distance of about 500 feet south from Intervale Road, in the easterly part of the development, appears to have been paved and water mains installed, but there is no evidence as to when or under what circumstances. The lots built upon were served by this drive or from Intervale Road. No other streets in the development were improved prior to late 1955, and only about 600 feet of water main had been *340 installed, that on Fairway Place, the most easterly north-south street leading off Intervale Road, under circumstances now to be mentioned.
In April and May 1950 Reid applied to the township for this 600-foot installation of a water main, at municipal expense, the water system being municipally owned and operated, from the main on Intervale Road, southerly on Fairway Place. Reid did not at the time own all of the land on both sides of the street which the main would traverse. The municipality offered to share in the cost, provided Reid revised the map to provide for 100-foot-frontage lots and secured planning board approval. The township had no subdivision regulation ordinance at the time requiring approval of plats or installation of improvements by developers, as permitted under the old Planning Act. R.S. 40:55-12 to 14, inclusive, as amended L. 1948, c. 464, p. 1904, et seq. Perhaps it should be noted that the municipal position in this respect was taken prior to the decision in the Herman case holding that subsequent zoning ordinances are applicable to previously filed maps with respect to lot area and frontage requirements. An action in lieu of mandamus was instituted and the trial court denied Reid relief. Pending the litigation in August 1951 the township passed an ordinance relating to the extension of water mains, obviously bad for lack of a standard governing the exercise of the discretionary authority granted thereby. On appeal the Supreme Court reversed, holding that the ordinance was invalid and that Reid was entitled to relief by way of mandamus on the grounds that "it was an abuse of discretion to use the grant as a means of coercing the landowner into acceptance of the minimum lot-size restriction upon his lands, however serviceable to the common good." Reid Development Corporation v. Township of Parsippany-Troy Hills, 10 N.J. 229, 238 (1952). The court specifically said that there was no issue or claim that the requested enlargement of the service was indefensible on economic grounds, either on the basis of need or cost. As a result *341 of this case the 600 feet of water main on Fairway Place was installed by the municipality at its sole expense.
Immediately after the Supreme Court's decision was handed down June 23, 1952, Reid renewed an earlier request for some 3,060 feet of additional main. Three days previously the township had adopted an ordinance requiring that developers install water mains at their own expense. The exact location of the mains sought is not disclosed. The length stated is greater than is involved in the present action; I presume the general location is the same. Refusal of the municipality to accede to the demand resulted in another action in lieu of mandamus. The trial court denied relief. On appeal the Appellate Division held the ordinance invalid "because of the lack of statutory authority to impose the costs in the manner ordained," but found that there was no abuse of discretion, as a matter of fact, in the municipal refusal to extend the mains, on economic grounds. Reid Development Corporation v. Township of Parsippany-Troy Hills, 31 N.J. Super. 459 (July 16, 1954).
It is to be noted that there appears to have been no litigation involving any claim or demand by Reid for the construction of streets by the township.
On June 1, 1954 the township adopted a subdivision regulation ordinance pursuant to the authorization of the Planning Act of 1953 (N.J.S.A. 40:55-1.14 et seq.), requiring the approval of plats of subdivision by the governing body after favorable referral by the planning board, and the installation of improvements or guarantee thereof, as may be required by the governing body, including street pavement and water mains, before the granting of final approval and the filing of the map.
Plaintiff's evidence in the instant case goes beyond the issue presently before me. From all the evidence received pertinent to that issue I find the following facts:
Plaintiff corporation was organized in 1954. There is no evidence that it has any corporate connection with Reid Development Corporation, despite identity of counsel, other than an informal and apparently non-binding arrangement *342 permitting it to buy such lots in the development as it may from time to time desire. It is obviously not a largescale, assembly-line developer. As of October 1955 it owned 30 lots upon which it was building or proposed to build houses for sale. These included 10 of the 12 contiguously situated on the east side of Fairway Place in front of which the water mains had been installed by the township after the first Reid case (although there the street itself was not constructed), plus 8 more contiguous lots adjoining and south of the first 10. Its other 12 lots were scattered, in groups of two's to meet the zoning requirements. Two were on the south side of Pleasant Terrace and two on the north and two on the south side of Hilltop Terrace, both streets being short east-west ways connecting Fairway Place and Lake Drive. Two were on the northeast corner of Lake Drive and Hilltop Terrace and two on the opposite southeast corner. The final two were on the southeasterly side of Lake View Avenue, a short street cutting across the extreme northwesterly corner of the tract, far removed from all the other lots. In addition, plaintiff's president owned two lots on the south side of Pleasant Terrace and plaintiff had two lots on the south side of Hilltop Terrace under contract. There is no evidence as to just when any of these various lots were conveyed to plaintiff, but presumably they all were by deeds from Reid or Mrs. Herman. The other lots fronting on these various streets were owned by Reid, Mrs. Herman, or individual owners by prior deeds.
In 1954 plaintiff obtained building permits for four houses on eight lots and proceeded to commence the erection of houses. Two were on the east side of Fairway Place in the area where water mains were already installed. One was for the president's home on his lots on the south side of Pleasant Terrace and the other one covered the lots adjoining it on the east. It seems at least doubtful that the permits should have been issued by virtue of the Official Map and Building Permit Act of 1953, since none of them abutted on a street suitably improved or such improvement guaranteed, as required by N.J.S.A. 40:55-1.39. There *343 is no evidence of any arrangement having been made in advance to supply municipal water to the houses to be erected on Pleasant Terrace.
By letter of February 15, 1955 plaintiff wrote to the township council enclosing a map, offering to install streets on certain parts of the development at its own cost and expense in order to expedite its building program, and requested information concerning the performance bond it should post. I assume these streets were the ones on which the plaintiff owned the lots mentioned. There is no precise evidence of any formal reply thereto or evidence of any prior or subsequent demand by plaintiff for their construction by the township.
By letters from plaintiff to the township manager, dated May 19 and May 26, plaintiff advised that the houses for its president on the south side of Pleasant Terrace, and the one for sale on the two adjoining lots to the east, were practically completed, and requested the extension of the water main to serve them. There is no other written evidence of demand for extension of mains with respect to any other lots.
From here on the evidence as to what transpired is, for the most part, vague, lacking in certainty, and not substantiated by writings or records of official action.
The matters seem to have been handled by discussions between the manager, a committee of the council, plaintiff's president and Mr. Herman, then still living and representing plaintiff. By the pretrial order in the instant case the parties stipulated demand and refusal with respect to the installation of water mains and streets here involved and shortly to be detailed. While it is clear enough that plaintiff was told about this time that defendant would not extend any water mains at municipal expense, plaintiff's letter and the language of the subsequent written agreement, soon to be referred to, seem contrary to plaintiff's claim and the stipulation in the pretrial order with reference to streets. Plaintiff's testimony was that defendant insisted on a different kind of street construction in some particulars *344 than it offered to do, but the present mayor testified that all problems concerning streets had been settled and, in effect, that plaintiff dropped any claim it might have asserted for construction at public expense. I cannot resolve this conflict as to streets on the present evidence, even assuming it to be material.
I am satisfied that plaintiff was orally advised late in the Spring of 1955 that the municipality would not at public expense install the requested water mains to serve any of the lots owned by plaintiff, that certificates of occupancy would not be issued on the houses under construction, and that no further building permits would be issued as to other lots unless and until plaintiff submitted its plat for planning board and governing body approval under the subdivision ordinance. The municipality's position was that plaintiff was subject to the ordinance despite the old filed map and the fact that it was not the owner of all of the lots on the streets involved. It is clear that the township insisted on subdivision approval for the primary purpose of imposing on plaintiff the cost of installing the water mains and other improvements. Plaintiff's position was that defendant was obligated to install the mains under the Reid decisions; that there was no applicable authority to impose the cost of water mains on an abutting owner, and that it was not subject to subdivision regulation under the ordinance.
Neither side sought any judicial determination of the controversy, although several prompt avenues of decision appear to have been open to each, as for example, declaratory judgment and action in lieu of mandamus. An oral understanding appears to have been reached probably in July, to be later reduced to writing, to hold the controversy in abeyance for future resolution in some fashion as far as the obligations to install mains were concerned, and in the meantime to issue certificates of occupancy for the houses under construction and to issue further building permits on plaintiff agreeing to proceed with the water and street improvements at its own expense. Five more building permits were issued, again probably in July, covering two *345 lots at the southerly end of Fairway Place on the east side, two on the southerly side of Hilltop Terrace which plaintiff had under contract, two on the northerly side of the same street, two on the southeasterly corner of Lake Drive and Hilltop Terrace and two on the southeasterly side of Lakeview Avenue. The certificates of occupancy were also issued, but there is no evidence as to when.
Then followed, on October 4, 1955, the execution of the written agreement between the parties with the municipal authorization which is particularly involved in the present suit. I think it is fair to say that the basic object of it was to avoid litigation, certainly at the time and hopefully even in the future, and to aid plaintiff by permitting it to proceed with occupancy and further construction of houses without damaging delay, that is, to provide some temporary expedient means of overcoming the difficulties occasioned by the chain of circumstances arising from what appears to be an improvident issuance of the building permits in 1954. There was certainly a real and substantial dispute of a legal nature between the parties as to whether subdivision approval, with its concomitant obligations, was required. The municipality had a substantial public interest to regard  there had already been very considerable expensive litigation involving the development, the amount involved in these street and water improvements was great, and the question of precedent with respect to developments laid out on old filed maps was important. Plaintiff, as has so often been the case with development housing in recent years, was interested in speed and reduction of its costs. I cannot overlook the fact that, as far as the evidence discloses, there was no effort made by plaintiff or its predecessor to approach the municipality and to work out and settle the problems of utility improvements prior to its purchase of lots or commencement of construction. It is difficult to build a house without water and it is almost inconceivable that construction of several would be commenced before the builder knew what service was to be secured, especially in the light of the past litigation here.
*346 The agreement recites that plaintiff is the owner of certain lands in the course of development and that "a dispute exists between the parties hereto as to who is obligated to install water mains and introduce water service  and as to who should bear the cost and expense thereof." It then goes on to recite that plaintiff shall have permission to introduce water mains as described, at its own expense, without effect on the rights and obligations of the parties with respect to the introduction and cost of such mains. Again no mention of streets. Then follows a number of agreements by plaintiff to introduce roads and water mains on certain designated streets according to specified and detailed standards and procedure. Paragraphs 3 and 6 of the agreement are of paramount importance. The former reads as follows:
"The developer agrees to bear the entire expense of introducing roadways and water mains. If it shall hereafter and within the period of three years from the date hereof be determined by agreement, litigation or otherwise, that the whole or any portion of the cost and expense of introducing such water mains should properly be borne by the township, then the township agrees to at that time reimburse the developer to such extent and in such a manner as shall be so determined, but without interest. In no event, however, shall this obligation of the township exceed the total amount of $6,000."
Paragraph six reads:
"It being recognized by the parties hereto that a dispute exists between them as to who shall be required to install mains, and who should bear the cost thereof, it is the intention of the parties that none of the terms of this agreement or of any document to be presented herewith, nor the performance of any of the terms hereof, nor the execution and delivery of this agreement shall be for any purpose taken or considered as in any way affecting, changing, altering or having any effect upon the existing rights and obligations of the parties hereto with respect to such water mains and the cost of their installation."
Significantly, there is no mention of the obligation to install streets or any dispute with respect to the construction or cost thereof. I cannot avoid the inference therefore that *347 plaintiff either had never insisted on street construction at municipal expense or had long since given up whatever claim it might have once urged in that regard. Also curiously there is no mention of any reciprocating agreement by the township to issue certificates of occupancy or further building permits, but I am satisfied that was part of the understanding and was in fact carried out by the municipality and plaintiff received the benefit thereof.
Plaintiff did construct roads and install water mains on the streets where it owned any lots and where such improvements were not already in as previously noted. Its testimony was that the cost of the former was $40,427.51 and the latter $12,021.60.
Apparently there was no attempt by either side to resolve by any means the dispute reserved in the agreement. The instant case at law for money damages was commenced in March 1956. Fundamentally it does not seek judicial determination of that dispute as such. Rather, with respect to water mains, it in effect by its complaint seeks to cast aside the agreement as if it never had been entered into and is not binding in any respect, and to recover the full cost on the ground that defendant refused to fulfill its legal obligation to install them, that it was compelled to do so on defendant's demand under duress and by reason of economic necessity, and that defendant has been unjustly enriched as a result because it thereby received without cost a permanent revenue-producing utility. The only mention of the agreement is an allegation that the saving clause therein does not foreclose plaintiff from recovering its costs of the water mains. As to the streets, plaintiff, without mentioning the agreement, alleges also that it installed and dedicated the same at its own expense on defendant's demand, under duress and economic compulsion, whereas the cost should have been borne by defendant and assessed as a local improvement against the property owners benefited thereby, resulting in unfair discrimination against plaintiff with unjust enrichment to the defendant and other property owners. Again it seeks recovery of the full costs.
*348 Defendant denies any legal obligation and any duress or compulsion in either case, and specifically alleges that plaintiff is subject to subdivision approval under the Planning Act and "like all other developers and subdividers, should bear the expense of installing water mains and introducing roads." It further specifically pleads that it could not have been compelled to install the water mains at public expense by reason of economic considerations, along the lines relied upon by the Appellate Division in the second Reid case.
By reason of the variety of issues raised and the fact that this is a non-jury case, I directed by the pretrial order that the various issues be heard and determined separately. The first issue raised by plaintiff, that even if the subdivision regulation ordinance applied in this situation, with its consequent imposition of improvement costs on the developers, such could not extend to the installation of water mains where the water system is municipally operated by reason of lack of statutory authority, was decided adversely to the plaintiff as an abstract proposition of law. Lake Intervale Homes, Inc. v. Parsippany-Troy Hills Tp., 43 N.J. Super. 220 (Law Div. 1956).
The next issue, which is the only one expressly now before me for decision, is whether plaintiff with respect to the lands in question is subject to the subdivision ordinance so as to enable the defendant by virtue thereof to impose upon it all or any part of the cost of instituting the water mains and streets.
My conclusion is that the subdivision ordinance and its procedures and obligations has no application to this development in its present posture or to plaintiff.
The ordinance can rise no higher in its application than the legislative authorization. That can stem only from the permissive authority given by the Planning Act of 1953 to municipalities to provide for subdivision regulation by ordinance. We first must have regard to the basic rule of construction that legislation shall operate only prospectively and not retroactively, unless the latter intention is clear. I find no such clear expression in the Planning Act. *349 Perhaps even more important, the statute (N.J.S.A. 40:55-1.14) provides that "The governing body may by ordinance provide for the regulation of subdivisions * * * by requiring the approval * * * of all plats * * * before such plats may be filed with the county recording officer * * *" The pegs on which the right to regulate is hung are that there must be a "subdivision" involved as defined in the act, and that there must be involved a plat which has to be filed with the county recording office.
"Subdivision" is defined by N.J.S.A. 40:55-1.2 as "the division of a lot, tract, or parcel of land into two or more lots, sites or other divisions of land for the purpose, whether immediate or future, of sale or building development," and includes "resubdivision." The key word is "division." Resubdivision can only mean a further division of a division previously made. I cannot conceive of a combination of lots previously divided or delineated by a map as a dividing or a further dividing. I cannot agree with the contrary conclusion expressed by the Law Division in Clauss v. Postma, 32 N.J. Super. 147 (1954), by which decision I am not bound.
Nor do I know of any requirement of law or of practicality necessitating the filing of a new map where one is already on file showing new streets duly approved at the time by the municipal governing body  which was all the law required then  and there is to be no change in any particular in the street lay-out or in the lay-out of lots.
I therefore conclude there is no requirement of planning board approval under a subdivision ordinance or of the obligations imposed thereby where, as here, the development is represented by a map previously duly filed and there is no change in either street or lot lay-out. Even though the old Map Act had primarily a different purpose, a development is not brought within the coverage of the new Planning Act unless it falls within the limits prescribed therein by the Legislature, however desirable it might be, idealistically, to impose the public benefits of planning and regulation on *350 all subdivisions, old and new. The Legislature just has not so provided.
This view is, I believe, substantiated by the observations of the Supreme Court in two cases. In Magnolia Development Company v. Coles, supra, where the court struck down a municipal attempt to regulate extension of an old mapped subdivision in the absence of a subdivision ordinance, the court said (10 N.J., at page 228):
"If the defendant borough desires to exercise its police powers with respect to the regulation of new developments within its boundaries, it must do so within the framework of the statute provided for such purposes. * * *"
And in Ardolino v. Florham Park Board of Adjustment, supra, involving a change of lot lines on an old mapped development, the Chief Justice commented (24 N.J., at page 110):
"The plaintiffs had the right to accept the existing lot lines as laid down on the original subdivision, but in seeking a resubdivision of a portion of that map they subjected themselves to the terms of the act and the conditions validly imposed upon them by the planning board under the authority of the act."
The inference is clear to me that the Planning Act and municipal regulation thereunder can apply only to future subdivisions or resubdivisions.
There is equally sound practical reason for this construction. As beneficent as planning and subdivision regulations are they have to start somewhere, and it would be physically impossible to attempt to go back to the beginning, so to speak, and apply them to all old mapped subdivisions. Many such are decades old and partly or largely built up, with ownership of the lots in many, many hands. The statute obviously contemplates the requirement of subdivision approval only where the land encompassed is all in one ownership. How otherwise could the matter of plat approval and the bearing of the cost of improvements be practically or justly handled?
*351 But this holding does not mean that a municipality with an old mapped subdivision within its boundaries, dormant and undeveloped for years but suddenly come to life, is completely powerless to do anything but construct streets and other governmental improvements as such developers request at general public expense. Resort may be had to statutory provisions governing local improvements, with assessment of the cost against properties benefited, instituted either on the governing body's initiative or on the petition of property owners, R.S. 40:56-1 et seq., although it would appear to be too late to apply such in the instant situation. Without expressing any definite opinion, the use of this method might also be considered in connection with extension of existing municipal water mains (see R.S. 40:56-1(j), and Smith v. Florham Park, 3 N.J. Misc. 355 (Sup. Ct. 1925)), at least where considerations were not such as to compel installation at public expense under the principle discussed in the two Reid cases.
But I must be concerned with what the parties actually did, not what they might have done, and my conclusion on the issue just passed upon does not dispose of the instant case. Under the pretrial order as it presently stands there remains the issue of the defense of economic considerations as to the water main installation, and the availability of that defense as well as damages, including the effect of the $6,000 limitation in the agreement on water main cost reimbursement, the plaintiff only having offered evidence on the damage issue.
At the risk of being charged with judicial overzealousness, but as part of the duty of the trial judge in a public case, as I see it (see Vacca v. Stika, 21 N.J. 471 (1956), and note the remand by the Supreme Court in Mara v. Township of Parsippany-Troy Hills, 20 N.J. 274 (1955), prior to its final decision thereon reported in 24 N.J. 113 (1957)), I suggest for counsel's consideration that paragraph 7 of the present pretrial order perhaps does not set forth all the issues raised by the pleadings. I have in mind the issues raised by the denials in defendant's answer, *352 including the questions of duress and business compulsion, in point of fact and law and in applicability in a suit against a municipality with respect to municipal services within the municipality, and the question of unjust enrichment. I feel I should also mention a possible issue of public policy apparently not raised by the pleadings  may a party seeking municipal action of the nature here involved proceed to do the work himself and then sue at law to recover his costs, without first seeking relief in lieu of mandamus? The connotations of any such issue might well differ here between the water main and street improvements in view of the agreement of October 1955.
I am setting the further date of Monday, October 21, at 10 A.M. at Morristown, for the presentation of further evidence and argument by both parties on all remaining issues.
Additional briefs are required.