878 A.2d 785

GUNTHER JOCK, SHERRY OBERG, SANDRA BARRE AND GEORGE SOLLAMI, PLAINTIFFS-RESPONDENTS, v. ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF WALL, DEFENDANT-RESPONDENT, AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WALL, DEFENDANT, AND PAUL AMATO, JOYCE AMATO AND SHIRE REALTY, INC., DEFENDANTS-APPELLANTS.

Argued March 15, 2005—Decided August 4, 2005.

*Timothy B. Middleton* argued the cause for appellants.

*Thomas J. Hirsch* argued the cause for respondent Zoning Board of Adjustment of the Township of Wall.

*Walter R. Bliss, Jr.,* argued the cause for respondents Gunther Jock, Sherry Oberg, Sandra Barre and George Sollami.

Justice LONG delivered the opinion of the Court.

In this land-use case, involving an application under *N.J.S.A.* 40:55D–70(c)(1) for bulk and dimensional variances to develop an isolated undersized lot, we are called upon to address the separate but related issues of merger and self-created hardship. More particularly, we have been asked to determine the scope of the merger doctrine enunciated almost forty years ago in *Loechner v. Campoli,* 49 *N.J.* 504, 231 *A.2d* 553 (1967). There we held that, despite separate designations on an old tax map, adjacent undersized lots in common title should be considered part of a larger tract or parcel for zoning purposes. The Appellate Division here ruled that *Loechner* does not require commonality of legal title and that merger can be compelled based on the conduct of a property owner in respect of an adjacent owner's lot or based on "equitable ownership" of separately titled property. We disagree. *Loechner* established a bright-line rule that applies only to properties in the same title ownership. Because the adjacent lots in this case were always titled in legally separate parties, no *Loechner* merger occurred.

We likewise conclude that the notion of self-created hardship requires an affirmative act that transforms a conforming property into one that is non-conforming. Although an applicant's failure to take steps to bring non-conforming property into compliance is one consideration for determining the existence of hardship, it is not a disqualifying self-created hardship.

I

The established facts are as follows: In 1939, at a time when Wall Township had no zoning ordinance, members of the Mauger

family divided an 85 acre tract of land fronting on Bass Point Road and abutting the Manasquan River into individual lots. Among them were Lots designated 25, 26, 27 and 28, all of which are implicated, to some extent, in this case. Residences were built on Lots 25, 26 and 28 prior to the enactment of a zoning ordinance. (All of those lots are undersized and non-conforming.) Lot 27 is vacant and wooded. Lots 26 and 27 are the primary focus of this case.

Lot 26 was created when it was conveyed from Ida B. and Charles B. Mauger to Kenneth L. and Jeanette Barre Thomson by a deed recorded on May 19, 1939. In turn, the Thomsons conveyed the property, by recorded deed, to Harry H. and Elizabeth L. Halsted in 1945, and the Halsteds conveyed it by recorded deed to Thomas W. and Hope D. Mason in 1946. Lot 27 also was created in 1939 when it was conveyed by recorded deed from Ida B. Mauger, individually, to Wilfred F. and Laura Lee Sherman, who also owned Lot 25.

The lots became non-conforming in 1955 upon the adoption of a zoning ordinance requiring a minimum lot area of one acre, a minimum width of 200 feet, a fifty-foot front yard setback and twenty-foot side and rear yard setbacks. The 1955 zoning ordinance made specific exception for preexisting non-conforming lots "provided the owner owns no adjacent land which may, without undue hardship to him, be included as part of the plot in question."

In 1957, the Masons conveyed Lot 26 to J. Clarence and Ethel M. Allen by recorded deed. Wilfred and Laura Lee Sherman still owned Lots 25 and 27 when the Allens purchased Lot 26. Shortly thereafter, the Shermans conveyed Lot 27, along with Lot 25, to their son, Donald Lee Sherman by deed recorded on November 15, 1957. Wilfred and Laura Lee Sherman retained the right to live on Lot 25 for the remainder of their lives.

A year or two after moving into the house located on Lot 26, Clarence Allen approached Wilfred Sherman about acquiring a twenty-foot strip of property from Lot 25 to add to Lot 26 to make

it conform to the twenty-foot side yard requirements in the 1955 Ordinance. Wilfred Sherman set a price of $2,000 for the twenty-foot strip. During the course of those negotiations, Allen also agreed to purchase Lot 27, at a total cost of $8,000 for both properties.

Thereafter, the Shermans applied to the planning board for approval to subdivide Lot 25 to provide the twenty-foot strip to the Allens to add to Lot 26. The planning board approved the subdivision in 1959. The approval was conditioned on the zoning board granting a variance to allow a five-foot side-yard setback on Lot 27, in exchange for the Allens' grant to the township of a drainage easement across the twenty-foot strip of land that had been added to Lot 26.

At closing, the Allens directed that Lot 27 be placed in their son Robert's name. On January 27, 1960, the property was recorded as sold to Robert M. Allen. At his deposition, Clarence testified that the lot was a gift to his son, and that at the same time, he had set up a bank account for his other son, Raymond, that contained an amount equal to the value of the lot. Clarence intended to increase the bank account in proportion to escalating real estate prices. However, prices eventually skyrocketed and he was unable to match the value of Lot 27. When that occurred, Clarence asked Robert to give Raymond a half-interest in the vacant lot. Presumably the bank account was to be shared equally as well. Robert willingly agreed and on December 3, 1974, a half-interest in Lot 27 was recorded as having been conveyed to Raymond.

Over the years and with the knowledge and approval of his sons, Clarence used Lot 27 for various purposes. In 1960 he built a tool shed and ran electricity from his house to the shed. The shed held Clarence's tools along with certain equipment purchased by all the neighbors for the neighborhood's use. Clarence paid for the shed building materials, but in his deposition, Raymond testified that he and Robert actually built the shed with their father as a family project. Subsequently, Clarence enclosed both lots with a fence so that his dog would have a larger space in which to run.

He also put a gate at the Lot 28 side of the property so that the residents of Lot 28 could use Lot 27 for walks if they wished. Clarence planted a vegetable garden on Lot 27 and paid to install a bulkhead along both lots. In addition, in 1987, he dug a well on Lot 27 and placed a pump in the tool house to provide water to both lots. He also paid the taxes on Lot 27.

Raymond testified that he and his brother, who did not live in the area, had taken care of the upkeep on Lot 27. During visits home, he and Robert would clean up the brush, mow the lawn, and keep the honeysuckle from growing wild. He asserted that his father discussed all measures regarding the lot with him and that he and his brother were happy with the fact that their father was keeping himself busy with projects on their property. Robert and Raymond considered themselves the owners of Lot 27.

In 1989, the elder Allens (who were in their 80s) told their sons that they wished to move away and suggested the possibility of selling both properties. The sons apparently had no desire to build on Lot 27 and, after a family discussion, it "was mutually agreed that selling was the best thing to do." In July of 1989, the lots were listed separately for sale with Barrie Riddle of the Folk Real Estate Agency. Although the elder Allens signed both agreements, Riddle testified unequivocally in depositions that she was always aware that Raymond and Robert were the owners of Lot 27. Riddle stated that, in addition to her communications with the elder Allens, who were accessible because they lived nearby, "anytime anything would come up on the properties, I would speak with Robert." Moreover, she indicated that, from her dealings with the family, she believed that the elder Allens were discussing all matters with their sons and that the entire family needed to approve of any sale of the properties.

During the winter of 1990–1991, defendant Paul Amato became aware that Lots 26 and 27 were for sale. Apparently because of the senior Allens' name on the sales agreement and because he knew that undersized lots in single ownership could be considered merged, Amato contacted John Hoffman, the zoning officer for

Wall Township, and asked if Lots 26 and 27 had merged. On April 18, 1991, Hoffman sent Amato a letter stating that in 1950, there had been a subdivision of Lot 25, creating new Lots 25 and 26 and 26A.[1] The letter stated further that:

> (1) Lot 26 is currently owned by Ethel and Clarence Allen and Lot 27 is owned by Raymond and Robert Allen. Since the lots are under separate ownership, there was no merger of the two and a re-subdivision would not be necessary.

In October of that year, Amato obtained another opinion letter from Hoffman stating that the five foot side-yard setbacks on Lot 27, granted by the board in 1959 were still in effect. Amato subsequently made an offer to purchase Lot 26 for $400,000 and Lot 27 for $100,000 without any contingencies.

The Allens' attorney prepared separate contracts for the sale of each lot. Clarence and Ethel were the sellers of Lot 26, and Robert and Raymond of Lot 27. Each contract listed Paul Amato as the buyer and contained a provision stating:

> The buyer [Amato] has the right to assign this contract or take title in the name of some other entity in which he has a controlling interest upon the express agreement that he shall continue to remain responsible for the obligations set forth in this agreement and will personally execute the note and note mortgage referred to herein.

In accordance with that provision, Amato assigned his rights to Lot 27 to Shire Realty, Inc., a corporation in which he is a 50% shareholder. On January 6, 1992, Clarence and Ethel Allen transferred the title to Lot 26 to Amato for $400,000, and Robert and Raymond Allen transferred the title to Lot 27 to Shire Realty for $100,000. Robert and Raymond split the proceeds from the sale of Lot 27.

Amato immediately placed Lot 26 back on the market. Shire then applied to the zoning board for permission to construct a house on Lot 27. Amato was a member of the board at the time. In late January 1992, Sandra Barre and George Sollami, potential buyers, who had been made aware of the Hoffman letters and of

---

[1] 26A is now Lot 27.

Shire's variance application to build on Lot 27, contracted to purchase Lot 26 for $412,500.

In April and May of 1992, the zoning board held hearings on Shire's application. Amato made the presentation to the board. Sherry Oberg, who with Gunther Jock, is the owner of Lot 28, appeared at both hearings and testified in opposition to the application. At the May 20 hearing, the board approved the variance application. On June 15, 1992, Barre and Sollami closed title on Lot 26.

Jock and Oberg filed a complaint in lieu of prerogative writs in the Superior Court of Monmouth County seeking reversal of the variance approval. After some procedural maneuvering that need not be recounted here, the lawsuit was pursued by Jock, Oberg, Barre and Sollami (collectively plaintiffs). Plaintiffs filed a motion for summary judgment, arguing that Amato had a conflict of interest because he was a member of the board, that Lots 26 and 27 had merged under the Allens' ownership as a matter of law, and that any hardship was self-created by Amato, thus precluding the grant of a variance.

The motion for summary judgment was denied and plaintiffs appealed. The Appellate Division reversed on the ground that Amato's appearance before the board on behalf of Shire was an impermissible conflict of interest. The panel did not reach the issue of merger.

On July 21, 1997, Shire filed a new application with the board, requesting approval to construct a single-family house on Lot 27. The board conducted a series of hearings to determine whether merger had occurred. It concluded that, despite some use by the elder Allens of their sons' property, with the sons' approval, the two lots were in separate ownership and thus had never merged as of the time that Amato and Shire purchased them. Further, the board determined that the lots did not merge under Amato and Shire, who were separate entities.

Hearings to decide the merits of the variance application were then held. After twenty-seven days, the board determined that Shire's hardship was not self-created. Furthermore, in terms of Shire's attempts to bring the property into conformity, the board concluded there was no available land that Shire could have purchased to increase the size of Lot 27 because Lot 26 was also undersized and because of the proximity of the house on Lot 28 to the Lot 27 property line. Moreover, the board found that the neighboring property owners were not interested in purchasing lot 27 at fair market value.[2]

The board concluded that the standards for a (c)(1) variance had been established. Specifically, the board found undue hardship due to the undersized nature of the lot (positive criteria) and that the grant of the variance would not be a substantial detriment to the public good or substantially impair the purpose of the zone plan and zoning ordinance (negative criteria). Accordingly, it went on to grant specific variances.[3]

On April 26, 2001, plaintiffs filed a complaint in lieu of preroga-tive writs seeking vacation of the board's decision and arguing that Lots 26 and 27 had merged as a matter of law. The trial judge disagreed, affirming the board's factual finding that the lots had not merged under the Allens or under Amato and Shire and rejecting plaintiffs' argument regarding "constructive merger," finding "nothing in real estate or municipal law to support such a concept."

---

[2] At the board's second hearing, plaintiffs indicated that they would be willing to buy Lot 27. In accordance with our decision in *Nash v. Bd. of Adjustment of Morris*, 96 N.J. 97, 107, 474 A.2d 241 (1984), fair market value was to be based on the assumption that a variance had been granted to build on the lot. After the zoning board conducted a hearing, it set the fair market value at $450,000. (The trial judge noted that that figure did not shock his conscience.) Once the value was set, plaintiffs stated that they would not be interested in purchasing the lot either separately or together, thus obviating the possibility of selling the lot to adjoining lot owners for fair market value.

[3] Variances were granted in connection with lot size and width, side and front yard setbacks, and height.

The trial judge went on to review the history of the case and concluded that Lot 27 is undersized and non-conforming as a result of a zoning change and not through any action by Shire or its predecessor in title. The judge also took into account Shire's efforts to sell Lot 27 to the plaintiffs for fair market value. Finally, the judge affirmed the zoning board's finding that Shire had satisfied the positive and negative criteria in *N.J.S.A.* 40:55D–70.

Plaintiffs appealed and the Appellate Division reversed. *Jock v. Zoning Bd. of Adjustment of Township of Wall,* 371 *N.J.Super.* 547, 561, 854 *A.*2d 928 (2004). In ruling, the court rejected Shire's argument that identity of legal title to the adjacent lots is the critical path to merger. *Id.* at 551, 854 *A.*2d 928. The panel concluded that *Loechner* is not limited to cases in which one party holds title to contiguous lots; rather, where one party exercises dominion and control over the contiguous non-conforming lot of another or where the property is in equitable or constructive ownership, that is sufficient for *Loechner* merger purposes. *Id.* at 555–56, 854 *A.*2d 928.

More particularly, the court pointed to Clarence Allen's previously detailed activities on Lot 27 as evidence of ownership, warranting a merger conclusion. *Id.* at 560, 854 *A.*2d 928. In addition, the panel found that merger had separately occurred when Amato purchased Lots 26 and 27 from the Allens because Amato was the "equitable" owner of both lots during the period prior to the closing of title. *Ibid.* Further, the panel concluded that because Amato was a principal shareholder in Shire, the properties merged under *Loechner* when Amato took title to Lot 26 and Shire to Lot 27. *Ibid.*

The panel also determined that the efforts of the elder Allens and Shire to avoid merger "rendered the isolation of the non-conforming lot a self-created hardship." *Id.* at 551, 854 *A.*2d 928. Finally, the panel rejected Amato's arguments that the municipality and the plaintiffs were estopped from asserting claims in

respect of Lots 26 and 27.[4] *Id.* at 561, 854 *A.*2d 928. We granted Amato's petition for certification. *Jock v. Zoning Bd. of Adjustment of Township of Wall,* 182 *N.J.* 151, 862 *A.*2d 59 (2004).

## II

Shire argues that *Loechner* does not apply to property legally in separate ownership; that any other interpretation will create chaos in the land-use field with no concomitant benefit; that *Loechner* is not applicable to Lot 26 because it was created pursuant to the Planning Act; that the zoning board was estopped from adopting plaintiffs' merger conclusion because of the contrary written advice of the zoning officer; and that Sollami and Barre were well aware of the status of the lots before purchasing Lot 26, and are thus estopped from asserting claims against Amato.

The zoning board supports Shire, arguing not only that the Appellate Division improperly expanded *Loechner,* but also that the decision has placed the title of all contiguous undersized lots in doubt. According to the board, under *Loechner,* when an application to develop an undersized lot is filed, it is able to determine if the lot had merged simply by viewing the chain of title to ensure that it was never jointly owned with an adjoining lot. The board argues that it now will be compelled to ascertain the identity of parties who owned any adjoining properties, determine their relationship to the adjoining lot owners and assess factually whether they ever exercised dominion and control over the nonconforming lot. The board also argues that the zoning officer's representations to Shire should be honored; that Barre and Sollami should be barred from relief because they were well aware of Shire's proposed use of Lot 27 when they purchased Lot 26; and that because Lots 26 and 27 were created under the Planning Act, they are exempt from merger.

---

4 Those rulings rendered plaintiffs' challenges to specific variances moot and therefore those issues were not addressed.

Plaintiffs essentially track the arguments advanced by the Appellate Division in support of its decision: that *Loechner* incorporates situations involving the continuous exercise of dominion and control over a property such as occurred here; that Shire's hardship was self-created; that the planning board's actions in respect of Lots 26 and 27 was not of the type that would insulate the lots from merger; and that the doctrine of estoppel is inapplicable.

## III

■ Where a party comes into ownership of a single lot that does not meet the area and dimension requirements of the current zoning law, and that party does not own adjoining land, the lot is considered to be isolated and non-conforming. *Davis Enterprises v. Karpf*, 105 *N.J.* 476, 481, 523 *A.*2d 137 (1987); William M. Cox, *New Jersey Zoning and Land Use Administration*, § 12–1.1 (GANN 2005). In order to develop such a lot, the party must apply to the zoning board for a variance. That is what occurred in this case, and the variance was granted. Plaintiffs argue that that grant was unlawful because the lot in question, Lot 27, was, in fact, not "isolated," but was part of a larger tract in "common ownership," thus requiring subdivision approval prior to consideration of a variance application. That contention squarely places into issue the doctrine of merger.

## A

■ The term "merger" is used in zoning law to describe the combination of two or more contiguous lots of substandard size, that are held in common ownership, in order to meet the requirements of a particular zoning regulation. Robert M. Anderson, 2 *American Law of Zoning* § 9.67 (4th ed.2005). In effect, it requires subdivision approval for the development of individual substandard parcels if contiguous parcels have been, at any relevant time, in the same ownership and, at the time of such ownership, the parcel was not substandard.

 Merger is said to be "theoretical" in the sense that it does not preclude the treatment of the lots as separate for other purposes. The official map is not affected; neither are taxes, *Young v. Bergen County Bd. of Taxation,* 5 *N.J. Tax* 102, 108–09 (1982), or financing arrangements altered, *Family Savings Bank v. DeVincentis,* 284 *N.J.Super.* 503, 509, 665 *A.2d* 1119 (App.Div. 1995). *See* David J. Frizzell, *New Jersey Practice Land Use Law,* § 13.18 (2d ed.1999). Indeed, the issue of merger will never arise unless the property is specifically brought to the attention of the relevant land use board. *Ibid.* Thus, in reality, the so-called merger doctrine is simply the characterization of adjacent under-sized lots in common ownership as part of a larger tract or parcel with an eye toward effectuating present day zoning laws. *Fred McDowell, Inc. v. Bd. of Adjustment of the Township of Wall,* 334 *N.J.Super.* 201, 224, 757 *A.2d* 822 (App.Div.2000). *Loechner, supra,* is an example of that principle.

## B

In *Loechner,* the plaintiff and her husband acquired title as tenants by the entirety to three adjoining lots on which their house was situated. 49 *N.J.* at 507, 231 *A.2d* 553. The combined frontage of those lots (186, 187, and 188) was 75 feet. *Ibid.* Mr. Loechner later acquired title to two adjoining vacant lots (189 and 190) in his own name. *Ibid.* Those lots had a combined frontage of 50 feet. When Mr. Loechner died, title to the two adjacent lots passed to his wife. *Ibid.*

She then entered into an agreement to sell the two lots to a developer. *Ibid.* At the time of the sale, a municipal ordinance required a minimum of 75 feet of frontage and later was amended to require 100 feet of frontage. *Ibid.* Prior to transfer of title, the developer successfully applied to the zoning board for a variance to build on the lots. *Ibid.* The town refused to issue a building permit because it viewed the lots as part of Mrs. Loechner's larger parcel and because the developer had not applied for subdivision approval from the planning board. *Ibid.* The planning board

declined to grant subdivision approval because doing so would create an undersized lot. *Ibid.*

After exhausting her remedies, Mrs. Loechner filed an action in lieu of prerogative writs and prevailed in asserting that subdivision approval was not necessary because the five lots were delineated under the Old Map Act. *Id.* at 507–08, 231 *A.*2d 553. The Borough appealed and we certified the case directly. We identified the pivotal question:

> [W]hether the sale of two contiguous lots out of a group of five lots, *all in one ownership* and delineated on a map filed under the Old Map Act, is a subdivision and whether Planning Board consent to the said conveyance of the two lots is required.
>
> [*Id.* at 508, 231 *A.*2d 553 (emphasis added).]

In answering that question, we accepted as a given the doctrine of merger. We said:

> *The acquisition of title* by plaintiff to Lots 189 and 190 which were contiguous to Lots 186–188 created one parcel or tract of land consisting of five separate lots as shown on the Hitchcock map.
>
> [*Ibid.* (emphasis added).]

We went on:

> Plaintiff's contemplated conveyance of Lots 189 and 190 thereafter constitutes a prospective subdivision and requires the advance approval of the Planning Board unless she prevails on her argument that the delineation of these two lots on a filed map precludes the application of the subdivision statute and/or ordinance.
>
> [*Ibid.*]

In reaching our conclusion, we relied on the language of *N.J.S.A.* 40:55–1.2 that defines a subdivision as "the division of a lot, tract or parcel" and noted,

> The word 'lot' as used in the Subdivision Act must be read in context with the words 'tract or parcel of land' in order to ascertain its meaning. Consistent with recognized principles of statutory construction 'lot' takes its meaning from the other two words with which it is associated. *Martell v. Lane*, 22 *N.J.* 110, 123 *A.*2d 541 (1956); *Salz v. State House Commission*, 18 *N.J.* 106, 112 *A.*2d 716 (1955); *State v. Murzda*, 116 *N.J.L.* 219, 183 *A.* 305 (E. & A.1936); 2 Sutherland, Statutory Construction § 4908 (3d ed. 1443).
>
> [*Loechner, supra*, 49 *N.J.* at 510, 231 *A.*2d 553.]

Important to our analysis, as well, was the fact that the Old Map Act was merely a conveyancing aid whereas the Planning Act "was designed to afford municipalities desiring the advantages of

its provisions to enact comprehensive regulatory standards which would facilitate sound and orderly future municipal growth along preconceived lines, in short a planned community growth." *Ibid.*

Ultimately, we held that Mrs. Loechner's adjacent lots, although denominated on the Old Map, were, under the merger doctrine, part of a larger tract or parcel she owned, and that:

> [R]eduction in the size of a parcel or tract of land by a division into two or more smaller parcels is in the language of the Subdivision Act a 'subdivision' and subject to the statutory terms. *See Lake Intervale Homes, Inc., v. Parsippany–Troy Hills T[ownship],* 47 *N.J.Super.* 334, 136 *A.2d* 57 (Law Div.1957), *aff'd.* 28 *N.J.* 423, 147 *A.2d* 28 (1958). The separation of Lots 189 and 190 from the balance of the lots owned by plaintiff constituted a subdivision.
>
> [*Loechner, supra,* 49 *N.J.* at 511–12, 231 *A.2d* 553.]

We added that if the lots resulting from the proposed subdivision would meet all zoning requirements, except for area and dimensional standards, the subdivision should be approved subject to the grant of a variance.[5] *Id.* at 512, 231 *A.2d* 553.

■ In sum, a *Loechner* merger takes place as a matter of law where adjacent substandard lots come into common legal title. Although *Loechner* never actually used the word "merger," commentators and subsequent decisions have denominated the *Loechner* rule as a merger principle. Cox, *supra,* § 12–2 (stating *Loechner* is a merger case); Frizzell, *supra,* § 13.18 (stating "decisions in *Ardolino, Loechner* and *Ryan* [ [6] ] [gave] municipalities ... power to "merge" adjacent non-conforming properties"); 3 Rathkopf, *The Law of Zoning and Planning,* § 49.13 (2005) (citing *Loechner* and stating "merger requirements" may operate

---

[5] The fairly convoluted procedure limned in *Loechner,* involving applications to the planning board and the zoning board, was streamlined in the Municipal Land Use Law which allows the planning board to consider a variance application in a subdivision case. Cox, § 5–1.1; *N.J.S.A.* 40:55D–60.

[6] *Ardolino v. Bd. of Adjustment of the Borough of Florham Park,* 24 *N.J.* 94, 103, 130 *A.2d* 847 (1957) (stating delineation of lots on Old Map no guarantee of entitlement to develop); *Ryan v. Bd. of Adjustment of Woodbridge Township,* 49 *N.J.* 520, 524, 231 *A.2d* 562 (1967) (holding sale of one out of three contiguous lots held under common ownership and identified under Old Map Act was subdivision requiring approval).

upon contiguous undeveloped lots pursuant to *Loechner* ); *Scardigli v. Borough of Haddonfield Zoning Bd. of Adjustment,* 300 *N.J.Super.* 314, 320, 692 *A.*2d 1012 (App.Div.1997) (stating lots filed under Old Map Act under common ownership "merged").

## C

There are a number of recognized exceptions to the merger doctrine. For example, it does not apply to adjoining lots, owned by the same person, "all of which are found and certified by the administrative officer to conform to the requirements of the municipal development regulations and are shown and designated as separate lots, tracts or parcels on the tax map or atlas of the municipality." *N.J.S.A.* 40:55D–7; *Scardigli, supra,* 300 *N.J.Super.* at 320–21, 692 *A.*2d 1012. Likewise, it does not apply where a party who owns a non-conforming lot acquires a contiguous lot that fronts on a different street (back-to-back lots) and merger would not create a conforming lot. *Chirichello v. Zoning Bd. of Adjustment of Monmouth Beach,* 78 *N.J.* 544, 554 n. 2, 397 *A.*2d 646 (1979) (citing 2 Rathkopf, *The Law of Zoning and Planning,* § 32.06(2) (4th ed.1978) (stating "general rule that adjoining parcels in one ownership merge so as to constitute only one lot [is not applicable where back to back or "L" shaped lots are involved], since it would require a strained finding that these two lots were intended to form one exceptionally long, narrow plot and would be in total disregard of the fact that each fronts on a different street")); *Somol v. Bd. of Adjustment of Borough of Morris Plains,* 277 *N.J.Super.* 220, 228, 649 *A.*2d 422 (Law Div.1994) (stating *Chirichello* exception to merger doctrine does not apply if merger would create conforming lot). Given that the purpose of the merger doctrine is to bring non-conforming lots into conformity and thus advance the zoning scheme, those exceptions for cases where the property is already conforming or where it cannot be rendered conforming make sense.[7]

---

[7] *Cf. Dalton v. Ocean Township Zoning Bd. of Adjustment,* 245 *N.J.Super.* 453, 461, 586 A.2d 262 (App.Div.1991) (stating purpose of merger doctrine fulfilled

■ There is an additional exception that is applicable in this case. In *Pribish v. Corbett*, 105 *N.J.Super.* 407, 409, 252 *A.*2d 731 (App.Div.1969), the Appellate Division held that contiguous lots created pursuant to a subdivision approved under the Planning Act of 1953 do not merge. *Pribish* distinguished that situation from *Loechner:*

> Those cases dealt with lots mapped and platted pursuant to statutes antedating the Planning Act of 1953—statutes devoid of the significant and salutary protections of the public interest contained in that act. The lots here involved having once been finally approved by the planning board, operating under the standards of the Planning Act of 1953, as appropriate for separate home sites, that decision is in nowise impaired or rendered devoid of effect, insofar as the Planning Act is concerned, by the fact that two of such lots, adjacent to each other, have subsequently come into a single ownership. This is at least true where, as we find to be the case here, the owner has done nothing to destroy the distinct identity of the two lots as suitable building sites.
>
> [*Ibid.*]

■ That reasoning reflects the reality that, where property has already satisfied modern land planning rules, merger is unwarranted. Accordingly, once a lot has been created by a planning board pursuant to subdivision approval, it is exempt from the merger doctrine.

Plaintiffs argue that that exception does not apply here because the board's action in 1959 was not "of the type" required to invoke *Pribish.* The statutory definition of subdivision and the existing case law are instructive. Pursuant to *N.J.S.A.* 40:55D–7, a subdivision is:

> the division of a lot, tract or parcel of land into two or more lots, tracts, parcels or other divisions of land for sale or development. The following shall not be considered subdivisions within the meaning of this act, if no new streets are created: (1) divisions of land found by the planning board or subdivision committee thereof appointed by the chairman to be for agricultural purposes where all resulting parcels are 5 acres or larger in size, (2) divisions of property by testamentary or intestate provisions, (3) divisions of property upon court order, including but not limited to judgments of foreclosure, (4) consolidation of existing lots by deed or other recorded instrument and (5) the conveyance of one or more

not only where lot is conforming but also where resulting parcel more nearly meets current zoning standards).

adjoining lots, tracts or parcels of land, owned by the same person or persons and all of which are found and certified by the administrative officer to conform to the requirements of the municipal development regulations and are shown and designated as separate lots, tracts or parcels on the tax map or atlas of the municipality.

On its face, that statute appears to encompass the planning board action in 1959 that granted the Sherman's subdivision application for approval to sever a 20 foot strip from Lot 25 and create a new and more conforming Lot 26 conditioned on the Allens granting the town a drainage easement and the zoning board, in turn, granting the Allens a side yard setback variance on Lot 27.

Recently, the Appellate Division reached a similar conclusion. In *Menlo Park Plaza v. Planning Bd.*, 316 *N.J.Super.* 451, 459, 720 *A.*2d 626 (App.Div.1998), *certif. denied*, 160 *N.J.* 88, 733 *A.*2d 493 (1999), that court held that a proposal for a roadway through a lot, creating two slivers of property on either side, was sufficient to fall within the meaning of *N.J.S.A.* 40:55D–7. Likewise, in *Scardigli, supra,* the Appellate Division decided a case that has resonance here. There, the planning board had allowed severance of a small piece of one lot (Lot 6) so that it could be joined with another lot (Lot 8). 300 *N.J.Super.* at 317, 692 *A.*2d 1012. The Appellate Division held that even though a single owner held title to Lots 8 and 9, both of which were undersized, because the planning board had previously approved the reconfiguration of Lot 8, it could be sold without regard to Lot 9. "The doctrine of merger does not apply to them...." *Id.* at 321, 692 *A.*2d 1012 (citing Cox, *supra,* ch. 12–2.3, 210–11). That is what occurred in this case. Accordingly, the board's actions in 1959 in creating Lot 26 insulated it from *Loechner* merger with Lot 27.

## IV

 The merger inquiry could end there. However, because of the implications of the Appellate Division's holding that *Loechner* is a conduct-based analysis and does not require commonality of title, we choose to address plaintiffs' argument that the senior Allens were the true owners of both lots and that therefore

the fact of different legal title is of no consequence to a *Loechner* analysis, a premise with which we disagree.

Notably, the Court in *Loechner* did not deem the lots to have merged until all five were *titled* in Mrs. Loechner's name. Related ownership was obviously not within our contemplation as a merger trigger, nor was the issue of dominion and control. Rather, we intended the rule to operate, as a matter of law, to prevent the development of individual substandard lots, without subdivision approval, if contiguous parcels are or have been held in common title. Over the past 38 years and until the decision of the Appellate Division in this case, the view that *Loechner* requires identity of legal title appears to have been well understood. Indeed, plaintiffs were unable to cite a single New Jersey case that has ever considered a merger analysis in the absence of common legal title. The reason is obvious: simple logic requires commonality of title before lots can be considered part of a larger tract or parcel for zoning purposes. We note, moreover, that that approach has created no particular difficulties. As *Loechner* obviously recognized, the rule is straightforward and simple, requires only a title search, and results in uniformity and predictability of outcome.

On the contrary, plaintiffs' notion that we should import a conduct analysis into the merger doctrine would have major ramifications to land use authorities and would render the title of all contiguous undersized lots in doubt. It would further devolve upon the land use authorities the job of determining, not only the results of a title search, which, under *Loechner,* would be sufficient, but also the historical relationship between and conduct of adjoining property owners toward each other and toward the land. It goes without saying that the proof problems would be complicated and the nature of the proceedings vastly expanded. That same onus would fall on all purchasers of undersized lots, in contravention of the accepted principle that a purchaser should be able to rely on record title. *Palamarg Realty Co. v. Rehac,* 80 *N.J.* 446, 453, 404 *A.*2d 21 (1979) (citing Donald B. Jones, *The New*

*Jersey Recording Act A Study of its Policy,* 12 *Rutgers L.Rev.* 328, 329–30 (1957)).

Plaintiffs argue that we should be willing to pay that institutional price because their interpretation of *Loechner* could result in more zoning conformity by sweeping in more lots. Even if that is true, it would be at too steep a cost: the proliferation of merger litigation with complex proof problems and the loss of simplicity, uniformity and predictability. Further, it will merely assure that parents will never buy adjoining property for their children and that related legal entities will be assiduous in purchasing only non-contiguous lots for fear that any informality in the way the lots are treated will cause them to merge. In other words, the undersized lots will still be sold and likely developed, but not by adjacent owners.

That convoluted methodology with its complicated proof problems and lack of societal benefit was not what we intended in *Loechner*. Rather, we intended the legal merger principle to be a narrow, bright-line rule applicable only to properties in common legal title.

▇▇▇ Our holding dovetails with the approach taken by the vast majority of jurisdictions that have accepted a merger doctrine. To be sure, the states have not adopted a monolithic approach to the subject. Thus, some hold that merger of adjacent undersized lots in common title is "automatic." *See, e.g., Farley v. Town of Lyman,* 557 A.2d 197, 200 (Me.1989). Others hold that merger of adjacent undersized lots in common title is not "automatic," but, in addition, requires an assessment of the "intent" of the parties. *See, e.g., Iannucci v. Zoning Bd. of Appeals of Town of Trumbull,* 25 *Conn.App.* 85, 592 A.2d 970, 972–73 (1991). Regardless of the approach adopted, the leitmotif that runs through the overwhelming majority of cases, including those cited by plaintiffs, is that commonality of legal title is the base line for a merger analysis. *See, e.g., Friends of the Ridge v. Baltimore Gas and Electric Co.,* 352 *Md.* 645, 724 A.2d 34, 38 (1999); *Appeal of Weeks,* 167 *Vt.* 551, 712 A.2d 907, 910 (1998); *Robillard v. Town of Hudson Zoning*

*Bd. of Adjustment,* 120 *N.H.* 477, 416 *A.*2d 1379, 1381 (1980); *Schultz v. Zoning Bd. of Appeals,* 144 *Conn.* 332, 130 *A.*2d 789, 792 (1957); *Tinicum Township v. Jones,* 723 *A.*2d 1068, 1072 (Pa. Cmwlth.Ct.1998). We agree. Under that standard, Lots 26 and 27 did not merge when they were titled in the senior and junior Allens respectively, and we reverse the Appellate Division's conclusion to the contrary.

## V

Plaintiffs raise entirely different merger arguments in respect of Amato and Shire. Unlike the claims regarding the Allens that are solely conduct-based, plaintiffs urge, not that Amato and Shire "treated" the lots as one, but that they actually held Lots 26 and 27 in common legal title. We will address those arguments serially.

## A

Plaintiffs first contend, and the Appellate Division agreed, that Lots 26 and 27 merged into common title when Amato contracted to purchase them because he became the equitable owner of both lots. We disagree. The doctrine of equitable ownership or equitable conversion is not a fixed rule but a fiction devised to achieve justice between the parties to a real estate transaction. *N.J. Highway Auth. v. Henry A. Raemsch Coal Co.,* 40 *N.J.Super.* 355, 361, 123 *A.*2d 83 (Law Div.1956). Thus, for example, the doctrine has been used as a loss allocation device as between the parties to a real estate contract where property is damaged or destroyed after a contract is executed but before title has passed. *See, e.g., Coolidge & Sickler, Inc. v. Regn,* 7 *N.J.* 93, 99, 80 *A.*2d 554 (1951).

The doctrine is also commonly applied to cases in which a party to a real estate contract dies before closing. Equitable conversion is invoked to require the decedent's estate to carry through with the transaction, thus giving effect to the intent of the parties. *In the Estate of Yates,* 368 *N.J.Super.* 226, 235, 845 *A.*2d 714 (App.

Div.2004) (citing *Courtney v. Hanson*, 3 *N.J.* 571, 575, 71 *A.2d* 192 (1950)). The doctrine rests on the principle that, as between parties to a contract, equity regards things as done that were agreed to be done. *Cox v. RKA Corp.*, 164 *N.J.* 487, 495, 753 *A.2d* 1112 (2000); 17 *Williston on Contracts* 50:42 (4th ed.2004). The contract itself is the key.

A necessary corollary of the rule is that the doctrine will not be applied where it is apparent from the contract that the parties intended that it should not operate as an equitable conversion. *Williston, supra,* § 50.42; *Gallicchio v. Jarzla,* 18 *N.J.Super.* 206, 214, 86 *A.2d* 820 (Ch.Div.1952). Thus, for example where a contract provision specifically allocates the risk of loss between execution and closing, the doctrine of equitable ownership will not place the loss elsewhere. *Coolidge, supra,* 7 *N.J.* at 98, 80 *A.2d* 554 (citing *Marion v. Wolcott,* 68 *N.J. Eq.* 20, 22, 59 *A.* 242 (Ch.1904); *Cropper v. Brown,* 76 *N.J. Eq.* 406, 74 *A.* 987 (Ch. 1909)). In essence, equitable conversion is invoked to give effect to the mutual intent of the parties. Importantly, the doctrine does not effect a transfer of legal title. *Cox, supra,* 164 *N.J.* at 495, 753 *A.2d* 1112.

There is simply nothing about the contracts for Lots 26 and 27 that would warrant application of the doctrine of equitable conversion. First, plaintiffs are third parties seeking to invoke the doctrine to their advantage and not to give expression to the wishes of the Allens and Amato. That is not a legitimate use of the doctrine. Second, there is nothing in the contracts to suggest that the parties expected, intended or even imagined that they would eliminate the separate legal titles in which the properties had been held up to that point. In fact, in light of the efforts Amato took to insure that the lots would not merge, including obtaining Hoffman's representations to that effect, and his reservation of the right to take title in Shire's name, plaintiffs' proposed equitable conversion would appear to thwart and not carry out the intent of the parties. Thus, the Appellate Division's conclusion that the contract of sale to Amato operated to transfer title to him

on an equitable conversion basis is an unsupportable application of the doctrine. Accordingly, the lots did not merge when Amato contracted to buy them.

B

Plaintiffs also argue and the Appellate Division agreed that merger occurred when Amato and Shire took title to Lots 26 and 27. That conclusion is likewise wide of the mark. As indicated above, the lots had not merged under the Allens. Thus, they were sold separately—Lot 26 to Amato alone, and Lot 27 to Shire Realty, a corporation in which Amato and his wife were sole shareholders. Those are entirely distinct legal entities entitled to recognition by the court. *See Lyon v. Barrett,* 89 *N.J.* 294, 445 *A.*2d 1153 (1982) (stating professional corporation and its sole owner are separate entities which will be respected); *L.B.D. Construction v. Dir. Div. Taxation,* 8 *N.J. Tax* 338 (1986) (noting individual and corporation of which he is sole shareholder are separate legal entities entitled to recognition by courts).

Even if Amato and his wife, as the sole owners of Shire Realty, were viewed as the actual owners of Lot 27, (as opposed to the corporate owners) that would not advance plaintiffs' position because Amato alone owned Lot 26. *See, e.g., Carciofi v. Bd. of Appeal of Billerica,* 22 *Mass.App.Ct.* 926, 492 *N.E.*2d 747 (1986) (stating lots owned individually and adjoining lot owned as tenant in common with another were not in common ownership).

Moreover, if the Amatos jointly owned Lot 27 and Amato individually owned Lot 26, the situation would be identical to that in *Loechner* before the properties were deemed to have merged. There, as in this case, some of the property was titled solely in the husband while the husband and wife jointly held title to the rest. *See Loechner, supra,* 49 *N.J.* at 507, 231 *A.*2d 553. Nevertheless, we did not find that merger had occurred until the husband's death resulting in Mrs. Loechner alone having legal title to all of the lots. *Id.* at 508, 231 *A.*2d 553. Because these circumstances are, at best, virtually identical to *Loechner,* ownership of one lot

by Amato and the other by Shire Realty does not allow a finding of merger.

## VI

We turn next to plaintiffs' claim that the hardship in this case was self-created by Shire or a predecessor in title thus barring Shire's right to a (c)(1) hardship variance. *N.J.S.A.* 40:55D–70(c)(1), provides:

> c. (1) Where: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to article 8 of this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property, [the zoning board shall have the power to] grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship[.]

■ Undue hardship refers solely to the particular physical condition of the property, not personal hardship to its owner, financial or otherwise. *See Isko v. Planning Bd. of Livingston,* 51 *N.J.* 162, 174, 238 *A.2d* 457 (1968), *abrogated on other grounds, Commercial Realty and Resources Corp. v. First Atlantic Properties Co.,* 122 *N.J.* 546, 585 *A.2d* 928 (1991).

■ The availability of a hardship variance depends on how the hardship was created. If an owner who was entitled to a hardship variance sells to a buyer who is aware of the nonconformity, the buyer does not lose the right to a variance because of that knowledge. *Harrington Glen Inc. v. Municipal Bd. of Adjustment of the Borough of Leonia,* 52 *N.J.* 22, 28, 243 *A.2d* 233 (1968) (stating where neither owner of lot at time of adoption of zoning ordinance which made lot undersized, nor subsequent owner, does anything to create condition for which variance is sought, right to relief possessed by original owner passes to successor in title). Likewise, if the prior owner was not entitled to a hardship variance, that impediment would pass to a buyer, even one who had no hand in creating the hardship. *Ketcherick v.*

*Borough of Mountain Lakes Bd. of Adjustment,* 256 *N.J.Super.* 647, 654, 607 *A.2d* 1039 (1992)(citing *Commons v. Westwood Zoning Bd. of Adjustment,* 81 *N.J.* 597, 606, 410 *A.2d* 1138 (1980) (stating hardship may be deemed self-imposed if property owner or predecessors in title created non-conformity)).

■ Where the hardship has been created by the applicant, or a predecessor in title, relief will normally be denied:

> If the property owner or his predecessors in title created the nonconforming condition, then the hardship may be deemed to be self-imposed. To measure this type of impact it is necessary to know when the zoning ordinance limitations were adopted and the status of the property with respect to those limitations at that time. Thus, if the lot had contained a 75–foot frontage and despite the existence of that requirement, the owner sold a 40–foot strip of the land, he or his successors in title would have little cause to complain. Likewise no undue hardship is suffered by an owner of a lot with a 35–foot frontage who acquired an adjoining 40–foot strip so that the lot complied with the ordinance and then sold a part of the land. These examples serve to illustrate the nature of a self-inflicted hardship which would not satisfy the statutory criteria.
>
> [*Commons, supra,* 81 *N.J.* at 606, 410 *A.2d* 1138.]

■ As those examples reveal, a self-created hardship requires an affirmative action by the landowner or a predecessor in title that brings an otherwise conforming property into non-conformity. *See, e.g., Barnes Land Corp. v. Bd. of Adjustment of Township of Wyckoff,* 174 *N.J.Super.* 301, 416 *A.2d* 431 (App.Div.1980) (finding plaintiffs' hardship self-created because predecessor in title had divided larger conforming property); *Ketcherick, supra,* 256 *N.J.Super.* 647, 607 *A.2d* 1039 (finding hardship self-imposed because predecessor in title sold adjacent lot that together with lot at issue exceeded minimum bulk requirement of the zoning ordinance); *Herman v. Bd. of Adjustment of Parsippany–Troy Hills Township,* 29 *N.J.Super.* 164, 102 *A.2d* 73 (stating where owner of 322 contiguous lots divested self of 90 non-adjacent lots on eve of zoning upgrade to isolate them and thus qualify for variances, hardship self-imposed); *Branagan v. Schettino,* 100 *N.J.Super.* 580, 242 *A.2d* 853 (App.Div.1968) (holding where predecessor in title owned two adjoining, integrated lots, which together conformed with requirements of zoning ordinance, and thereafter sold one, hardship was self-created). Here, when Lot 27 was created

in 1939, it complied with then existing zoning laws. The hardship associated with it was created in 1955 when the zoning ordinance was changed and, as a result, the lot no longer met the minimum lot area or dimensional requirements. Thus, when Lot 27 was purchased by Robert Allen, and later by Shire Realty, it was already non-conforming.

Plaintiffs nevertheless advance two distinct arguments under the self-created hardship rubric.

## A

The first is that by taking Lots 26 and 27 in separate title, the Allens and later Shire "created" the hardship. That contention misconceives the nature of self-creation and misreads the decisions in the hardship cases. In *Barnes, Ketcherick, Branagan* and *Herman, supra,* the applicant or a predecessor in title turned conforming parcels into non-conforming ones and thus created the hardship. That is not what happened here. It is one thing to say that a property owner, who takes affirmative steps to render conforming land non-conforming, should be deemed as "creating" his own hardship. It is quite another to suggest that parties who purchase non-conforming property and do not take affirmative steps to render it conforming are complicit in creating the hardship. They are not. By taking Lots 26 and 27 in separate titles, the Allens and later Amato and Shire did nothing to create or enhance the hardship connected with the lots.

Nor do we subscribe to plaintiffs characterization of the way in which Lots 26 and 27 were titled by the parties as somehow nefarious. Property is often purchased and kept in diverse ownership in order to preserve a zoning advantage. That is an entirely legitimate practice to avoid the application of the merger doctrine. It is as acceptable in purpose as tax and estate planning to avoid or reduce the payment of taxes. Such planning does not "create" a non-conformity.

## B

Plaintiffs also argue that, by their activities on Lot 27, the elder Allens essentially obliterated the division between the lots, creating a single parcel that could not be later developed as two lots without violating the self-created hardship rule. To be sure, parties can volitionally join their undersized properties into a single lot and thus lose the right to develop the parcels separately on a hardship theory. Those circumstances, however, are few and far between. For example, if the elder Allens, with the consent of their sons, had built an addition to their house on Lot 26 that encroached across the property line onto Lot 27, the board could have found that utilization of both lots in the service of a single structure, although insufficient to establish a *Loechner* merger, barred the parties from selling the lots separately based on hardship. *See Chicalese v. Monroe Township Planning Bd.,* 334 *N.J.Super.* 413, 759 *A.*2d 901 (Law Div.2000) (stating where owner built structure across two undersized lots, later attempt to sell lots separately was "self-created" hardship).

As the board and trial judge properly found, the facts in this case fall far short of what would be necessary to invoke the above rule, which was not intended to open the floodgates of dominion and control litigation. The fact that the Allen sons allowed their father to use, and even improve their property, was not an indication that they agreed to the obliteration of the individual identity of the lots. Therefore, the separate sale of the lots was not a self-created hardship. As the trial court stated, in reaching that conclusion:

> Without doubt, Clarence Allen did use Lot 27 for various purposes while he was living on the adjoining Lot 26. His use of the sons' land was not adverse to their interests. As Robert Allen testified, both sons knew about the workshop and vegetable garden and fencing and the well and the bulkhead because Clarence told them about them and they saw them on visits home. In short, his uses were with permission of the owners because it kept their father busy and rendered no detriment to them.

In sum, the evidence was inadequate to establish that the parties obliterated the division between the lots such that sale of the individual lots was a disqualifying self-created hardship.

## VII

Concluding that the hardship was not created by Shire or a predecessor in interest, however, is not the end of the inquiry. In *Commons, supra,* we underscored the relevant considerations in these circumstances:

> Related to a determination of undue hardship are the efforts which the property owner has made to bring the property into compliance with the ordinance's specifications. Attempts to acquire additional land would be significant if it is feasible to purchase property from the adjoining property owners. Endeavors to sell the property to the adjoining landowners, the negotiations between and among the parties, and the reasonableness of the prices demanded and offered are also relevant considerations. *See Gougeon v. Stone Harbor Bd. of Adjustment,* 52 *N.J.* 212, 224, 245 *A.2d* 7 (1968), where it was held that if an owner of land refused to sell at a "fair and reasonable" price he would not be considered to be suffering an "undue hardship." If on the other hand the owner is willing to sell at a "fair and reasonable" price and the adjoining property owners refuse to make a reasonable offer, then "undue hardship" would exist.
>
> [81 *N.J.* at 606, 410 *A.2d* 1138.]

A similar alternative would be for the applicant to purchase adjacent land to achieve conformity.

 Thus, the attempt made by a party to bring the property into conformity by purchase from or sale to adjoining owners is a factor for consideration, even where the non-conforming status of the property was originally created through no fault of the then owner or his predecessor. *Dallmeyer v. Lacey,* 219 *N.J.Super.* 134, 146, 529 *A.2d* 1063 (Law Div.1987); *Davis, supra,* 105 *N.J.* at 482, 523 *A.2d* 137 (citing *Chirichello, supra,* 78 *N.J.* at 555–56, 397 *A.2d* 646). Accordingly, in its discretion, a board may recognize an offer to sell or purchase the land of an adjoining property owner by conditioning the grant of a variance thereon. *Nash, supra,* 96 *N.J.* at 106, 474 *A.2d* 241.

Alternatively, as Judge Havey observed in *Kogene Bldg. & Development Corp. v. Edison Township Bd. of Adjustment,* 249 *N.J.Super.* 445, 457, 592 *A.2d* 626 (App.Div.1991):

> Instead of establishing fair market value for the purpose of granting a conditional variance, the board, in deciding the threshold question of whether undue hardship exists (the positive criterion), considers whether the owner has offered the lot for sale to the adjoining property owners based on the fair market value of the

property assuming that all necessary variances have been granted. *See Dallmeyer v. Lacey T[ownship] Bd. of Adjustment,* 219 *N.J.Super.* 134, 139, 529 *A.2d* 1063 (Law Div.1987); W. Cox, New Jersey Zoning and Land Use Administration § 12–1.3, at 176–78 (1990). If the offer is rejected, "undue hardship" generally exists. *See Dallmeyer,* 291 [219] *N.J.Super.* 134, 139, 529 *A.2d* 1063 (Law Div.1987).

That is what occurred here. In the proceeding below, Shire offered Lot 27 to both adjoining property owners, the objectors in this case. After the establishment of fair market value, the adjoining owners declined the purchase. In light of that fact and because the hardship was not self-created, the board determined that Shire qualified for consideration for a hardship variance.

According to plaintiffs, that was not enough. They argue that under *Commons, supra,* Shire, which in 1992, was seeking a variance to build on Lot 27, was required to offer to sell the lot to Amato or to buy Amato's lot at fair market value just as if Amato were a stranger. Because there is no evidence in the record that that took place, plaintiffs argue that the board's finding of a hardship cannot stand. Concluding otherwise, they claim, breaches the acknowledged requirement of mitigation. Again, plaintiffs are wide of the mark.

As a practical matter, the 1992 variance is not under review here. As we have noted, it was invalidated in a prior Appellate Division decision. An entirely new variance application was filed in 1997. At that point, Lot 26 had been owned by Barre and Sollami for five years. Thus, to live up to the *Commons, supra,* requirement in this proceeding, Shire only had to offer the property to the current adjacent owners of Lot 26, (Barre and Sollami), and Lot 28 (Jock and Oberg), which it did.

Even assuming for the sake of argument however, that Shire's failure to offer the property to Amato in 1992 was relevant to the 1997 application, that would not preclude Shire from receiving a variance. Just as conduct in respect of a fair market value offer is not outcome determinative, neither would failure to offer property for sale necessarily be a disqualifier, although it would certainly be a factor for consideration. As we have said:

[A] fair market value offer to purchase the property by an adjoining owner is a relevant, but not dispositive, consideration in determining whether hardship exists. *See Gougeon v. Board of Adjustment of Stone Harbor,* 54 *N.J.* 138, 148–49, 253 *A.*2d 806 (1969) (*Gougeon II* ) (an adjoining property owner's fair market value offer by itself does not warrant a denial of grant of variance); *cf. Chirichello v. Zoning Bd. of Adjustment of Monmouth Beach, supra,* 78 *N.J.* at 555, 397 *A.*2d 646 (saleability of land is only another yardstick by which undue hardship is to be measured); 3 R. Anderson, *American Law of Zoning* § 18.54, at 292 (2d ed.1977) ("[a] land owner has the right to develop his land; he is not required to sell" his non-conforming property just because he received an offer to purchase). Courts in other jurisdictions have also approved hardship variances notwithstanding that the property owner received an offer to purchase from a neighbor. *See, e.g., Marchi v. Town of Scarborough,* 511 *A.*2d 1071, 1073 (Me.1986) ("[t]he fact that the property has a potential for sale to an abutting owner" does not preclude granting a hardship variance); *Macchia v. Board of Appeals,* 7 *Misc.*2d 763, 764, 164 *N.Y.S.*2d 463, 465 (Sup.Ct.1957) (refusal of reasonable offer from adjoining property owner was improper ground for denying application for building permit and variance because an administrative board cannot constitutionally compel a property owner to sell his property); *cf. Kent County Land Co. v. Zoning Bd. of Review,* 10 [100] *R.I.* 418, 421, 216 *A.*2d 511, 513 (1966) (an offer to purchase by an objector does not preclude granting of hardship variance).

. . . .

The import of our decisions is that an offer to purchase by an adjacent owner authorizes, but does not require, the denial of a hardship variance. *See, e.g., Commons v. Westwood Zoning Bd. of Adjustment, supra,* 81 *N.J.* at 606–08, 410 *A.*2d 1138 ("[e]ndeavors to sell the property to the adjoining landowners, the negotiations between and among the parties, and the reasonableness of the prices demanded and offered are also relevant considerations"); *Harrington Glen, Inc. v. Leonia Bd. of Adjustment,* 52 *N.J.* 22, 30–31, 243 *A.*2d 233 (1968) (willingness of neighbor or interested person to buy at fair price may be considered in determining hardship); *see also Chirichello v. Zoning Bd. of Adjustment of Monmouth Beach, supra,* 78 *N.J.* at 561, 397 *A.*2d 646 (in its discretion, board may consider propriety of variance conditioned on selling property to adjoining property owner). Notwithstanding the offer, a board may still grant the requested relief. *Gougeon II, supra,* 54 *N.J.* at 148–49, 253 *A.*2d 806.

[*Davis, supra,* 105 *N.J.* at 482–84, 523 *A.*2d 137.]

It follows that even if the failure of Shire to offer to sell to or buy from Amato was an error, it was not, as plaintiffs argue, a *per se* disqualifier for a hardship variance. It may be that the board was satisfied in 1992 that Amato's refusal of the offer was implicit in the entire transaction. It may also be that it concluded, in light of the zoning officer's representations, that to require a sale between Shire and Amato would contravene the purpose of the entire transaction. Certainly the board was satisfied, in respect of the

1997 application, that the refusal of Jock–Oberg and Barre–Sollami to purchase Lot 27 was sufficient evidence of efforts to bring the property into conformity.

In any event, whatever Shire did, or did not do, to bring the lot into conformity was only one consideration in the hardship calculus. In the final analysis, as we stated in *Kramer v. Bd. of Adjustment, Sea Girt,* 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965), public bodies, because of their peculiar knowledge of local conditions, must be allowed wide latitude in their delegated discretion. *See Booth v. Bd. of Adjustment of Rockaway Township,* 50 *N.J.* 302, 306, 234 *A.*2d 681 (1967). The proper scope of judicial review is not to suggest a decision that may be better than the one made by the board, but to determine whether the board could reasonably have reached its decision on the record. *Kramer, supra,* 45 *N.J.* at 296, 212 *A.*2d 153; *Kessler v. Bowker,* 174 *N.J.Super.* 478, 486, 417 *A.*2d 34 (App.Div.1979), *certif. denied,* 85 *N.J.* 99, 425 *A.*2d 264 (1980).

We are convinced from our study of the record that the action of the board in determining that Shire qualified for consideration for a hardship variance was not arbitrary, capricious, or in manifest abuse of its discretionary authority and that the trial court properly entered judgment to that effect.

## VIII

The merger doctrine enunciated in *Loechner* applies only to adjacent undersized lots held in common legal title. The lots in this case, having never been held in common legal title, did not merge under the Allens or under Amato and Shire. Further, neither the Allens, Shire, nor Amato "created" the hardship on Lot 27. The judgment of the Appellate Division to the contrary is therefore reversed. The matter is remanded to that court for consideration of the specific variance issues raised by plaintiffs that were not addressed below as a result of the court's merger and self-created hardship analyses. This ruling renders Shire's estoppel claims moot.

*For reversal and remandment*—Chief Justice PORITZ, Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.